#23874, #23875-rev & rem-RWS

**2006 SD 53**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

JOHN APLAND, GEORGE BEAN, MARTIN
BONATO, TOM COOPER, KIM COOPER,
ROBERT CROFFORD, LORITA CROFFORD,
TOM DAVIS, MARLENE DAVIS, ROBERT
FERRELL, JANET FARRELL, HARVEY
GARR, VALERIE GARR, PAUL GARR,
DANIEL KANE, ROSALIE FISHEL,
DOUG JOHNSON, FALSE BOTTOM
LIVESTOCK, GRACE G. KIRKSEY, EILEEN
RANDALL, KIM KLING, CHRIS KLING,
TERRY KUDLOCK, TIM KUDLOCK
SHARON KUDLOCK, K. KUDLOCK FAMILY
TRUST, HERBERT LESMEISTER,
MICHAEL LESMEISTER, WAYNE MASSIE,
MARGARET MASSIE, NEAL MCCOY,
KEVIN PARADIS, JERAL SHEAR,
DIANNE SHEAR, ROBERT SHEAR,
SCOTT STAVE, SUSAN STAVE, GARY
STEELE, KATHY STEELE, TRAVIS STEELE,
DEBRA STEELE, WESLEY THOMPSON,
And CATHALEEN WOOD,                                    Appellants,

　v.

BUTTE COUNTY, SOUTH DAKOTA,                            Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
BUTTE COUNTY, SOUTH DAKOTA

\* \* \* \*
HONORABLE JOHN W. BASTIAN
Judge
\* \* \* \*

ARGUED MAY 25, 2006
OPINION FILED **06/14/06**

KENNETH E. BARKER of
Barker Reynolds Law Firm
Belle Fourche, South Dakota

ROBERT L. MORRIS of
Day Morris Law Firm, LLP
Belle Fourche, South Dakota

Attorneys for appellants.

Attorneys for appellees.

SABERS, Justice

[¶1.] Apland and the other appellants (Apland) are appealing the circuit court's decision that affirmed the Butte County Director of Equalization's (Director) 2002 and 2003 assessments of rangeland property. Apland asserts that Director's methodology in applying SDCL 10-6-33.6 was clearly erroneous, and we agree. Director did not give appropriate consideration to appurtenant and nontransferable water rights.

## FACTS

[¶2.] In preparation for the assessment review for 2002, Director laid out a map of Butte County and proceeded to plot the land sales for 2000 and 2001. Director noted the sequence number and price per acre, not including any building value, on the map for each sale. Each of these forty-six sales were audited and approved by the South Dakota Department of Revenue. After plotting the sales, Director noted that the sales in the southern portion of the county were generally higher than the sales in the northern portion of the county. Director suspected that this difference was due to location. To see if his suspicion was correct, Director performed tests to determine whether the difference in sales price per acre was influenced by location.

[¶3.] Director performed eight pairings of northern and southern Butte County sales. He used sales similar in nature, considering factors such as location, soil quality, time of sale, use of property, and climate conditions. Director did not take into consideration appurtenant and nontransferable water rights or access to the Belle Fourche Irrigation District (BFID) in selecting these pairs. After

preparing these pairings, Director made adjustments only for soil rating to isolate any difference in sales price for location. He did not make an adjustment for the value of the appurtenant water rights. After preparing the pairings and making the appropriate soil adjustments, Director determined that property located in southern Butte County would be approximately 150 percent of the value of the same property in northern Butte County.

[¶4.] At the conclusion of the testing, Director determined the difference in sales price was based on location. Director then went through the process of identifying possible market areas or neighborhoods within Butte County. Director considered characteristics including: population, towns, road systems, markets, employment opportunities, vicinity of the Black Hills, vicinity of other municipalities such as Sturgis and Spearfish, historic precipitation, available listings of properties in southern Butte County, and the larger competitive base (more buyers) interested in southern Butte County. As indicated, Director did not consider appurtenant and nontransferable water rights or access to BFID. Once these characteristics were established, Director mapped out two neighborhoods, the Southern Neighborhood and the Northern Neighborhood.

[¶5.] Pursuant to SDCL 10-6-33.6, Director then determined whether the median market value in each neighborhood deviated by more than ten percent from the overall county median market value. To determine the county-wide median market value, Director listed the 2000 and 2001 sales for the entire county with the actual price paid per acre (market value) and calculated that the median market value per acre was $284.00 for the county as a whole. Director then listed the

fourteen 2000 and 2001 sales for the Northern Neighborhood. One sale included BFID water rights, but the acres with these water rights were located in the Southern Neighborhood. He determined the median market value per acre was $104.00 per acre, a -63.40 percent deviation from the county median market value per acre. Director then listed the thirty-two 2000 and 2001 sales for the Southern Neighborhood, of which thirty had BFID water rights. He determined the median market value per acre was $385.00 per acre, a +35.60 percent deviation from the county median market value per acre. Based on these calculations, Director determined that there existed more than a ten percent deviation from the overall county median market value per acre in both the Northern and Southern Neighborhoods.

[¶6.]    Based on this ten percent deviation from the overall county median market value, Director determined that SDCL 10-6-33.6 allowed him to establish a separate market value per acre for land within the Northern and Southern Neighborhoods. In order to ascertain this separate market value, Director used a top dollar value process for assessment. The top dollar value process worked off soil ratings that represent the productivity capability of a soil, with 1.0 representing the most productive soil in the county. Director performed a soil survey calculation for each sale in Butte County in 2000 and 2001 using the soil ratings provided by the South Dakota Department of Revenue. Director calculated the weighted average soil rating for each sale and took that times the sale price to determine the top dollar value for each sale. It was determined that the county-wide median top dollar value for all sales in 2000 and 2001 was $418.00 per acre.

[¶7.]    Director then performed the same analysis on sales in just the Northern Neighborhood and determined that the median top dollar value was $241.00 per acre. Therefore, a parcel with a soil rating of 1.0 in the Northern Neighborhood would be assessed at $241.00 per acre. The same analysis was done in the Southern Neighborhood, and Director determined that the median top dollar value was $642.00 per acre. In other words, a parcel with a soil rating of 1.0 would be assessed at $642.00 per acre. Director determined that the $642.00 top dollar value of the Southern Neighborhood could mean that some parcels with lower soil ratings in the Southern Neighborhood could be overvalued, mainly rangeland properties.

[¶8.]    Director then considered five sales, three of which included BFID water rights, of either rangeland or mostly rangeland, most with soil ratings less than .6 in the Southern Neighborhood. Director determined that the average top dollar value for rangeland soils in the Southern Neighborhood was $332.00 per acre. Using the Butte County Table 1.A soils ratings, Director determined that most of the rangeland soils in the county fell below a rating of .6. Because Director had determined that the top dollar value selected for rangeland soils in the Southern Neighborhood was $332.00 per acre and the top dollar value for the Southern Neighborhood was $642.00 per acre, he divided $332.00 by $642.00 to arrive at a 52 percent adjustment. This meant soil ratings of .6 or less were valued at 52 percent of the top dollar value in the Southern Neighborhood. Again, Director did not consider appurtenant and nontransferable water rights or access to BFID as factors.

[¶9.] To prepare for the assessment review for 2003, Director again laid out a map of Butte County and noted the sales on a per acre basis. None of the nine Northern Neighborhood sales had BFID water rights and all of the fourteen Southern Neighborhood sales had BFID water rights. Again, Director noticed that the sales price on a per acre basis varied between the Northern and Southern Neighborhoods. Director again suspected that the difference in price was due to location. Director performed seven rangeland pairings of Northern and Southern Neighborhood sales, considering various factors such as: location, soil quality, time of sale, use of property, and climate conditions. Again, appurtenant and nontransferable water rights and access to BFID were not considered as factors. Adjustments were made only for soil rating and time of sale. Based on these pairings, Director determined that there was anywhere from a 116 percent to 179 percent difference in per acre value as between Northern and Southern Neighborhood sales, with the higher land value being in the Southern Neighborhood.

[¶10.] Director next determined, under SDCL 10-6-33.6, that the median market value in each neighborhood deviated by more than ten percent from the county median market value. Director evaluated the nine sales in the Northern Neighborhood and observed that sale prices varied from $75.00 per acre to $140.00 per acre. Director calculated the median market value of the Northern Neighborhood to be $116.00 per acre. Fourteen sales occurred in the Southern Neighborhood, ranging from $175.00 per acre to $446.00 per acre. Director calculated the median market value of the Southern Neighborhood to be $345.00

per acre. Finally, Director calculated the countywide median market value per acre to be $253.00. Thus, the difference was -54.15 percent in the Northern Neighborhood and +36.17 percent in the Southern Neighborhood. Based on the greater than ten percent deviation in each neighborhood, Director determined that SDCL 10-6-33.6 allowed him to establish a separate market value per acre for the land in each of the two neighborhoods.

[¶11.] Director calculated the median assessed value to sale price ratio for all twenty-three sales in the county to be 96.87 percent. The median assessed value to sale price ratio for the nine sales in the Northern Neighborhood was calculated to be 84.14 percent. The median assessed value to sales price ratio for the fourteen sales in the Southern Neighborhood was calculated to be 101.99 percent. After making these calculations, Director made some adjustments. Director adjusted the assessed values in the Northern Neighborhood up three percent. This adjustment was made because South Dakota law requires that counties be assessed at least 85 percent of market value. Next, because some of the individual assessments in the Southern Neighborhood were greater than 100 percent, Director adjusted the assessed values in the Southern Neighborhood down 30 percent for all parcels with a soil rating over .68. This adjustment was made to eliminate most of the sales over 100 percent and achieve a better median ratio. After making these adjustments, Director determined that the median assessed value to sales price ratio for the entire county was now 89.27 percent, 88.35 percent for the Northern Neighborhood and 90.14 percent for the Southern Neighborhood.

[¶12.]     Director's methodology, procedure, and assessment figures were reviewed and approved by the Department of Revenue prior to the assessments being sent out for both the 2002 and 2003 assessments. Apland appealed these assessments to the circuit court. When reviewing the 2002 assessments, the circuit court held that Director complied with SDCL 10-6-33.6 in determining the median market value per acre in an identifiable region within Butte County deviated from the county median market value per acre by more than ten percent. The circuit court further held that Director properly established separate market values per acre of land within that region and that assessments based on these findings were valid assessments. Finally, the circuit court held that the evidence did not establish that the assessments lacked uniformity or were grossly inequitable without regard to full and true value of the appealed property.

[¶13.]     In reviewing the 2003 assessments, the circuit court held that pursuant to SDCL 10-6-33.3, Director properly verified that the assessment neighborhoods were still valid and not in excess of market value or full and true value. The circuit court further held that Apland had not established that the assessments lacked uniformity or were grossly inequitable without regard to full and true value of the appealed property. Apland appeals raising two issues that we have consolidated into the following issue:

> Whether the assessment of Apland's rangeland violated Constitutional requirements of equality and uniformity.

## Standard of Review

[¶14.]     "This is an appeal of a tax assessment pursuant to SDCL 10-11-43 and thus it is procedurally governed by SDCL ch 1-26." Butte County v. Vallery, 1999

SD 142, ¶8, 602 NW2d 284, 286-87. "This standard of review requires [this Court] to accord great weight to the findings and inferences made by the hearing examiner on factual questions." *Id.* (citing Clarkson & Co. v. Harding County, 1998 SD 74, ¶5, 581 NW2d 499, 501) (citation omitted). "When the issue is a question of fact, we ascertain whether the administrative agency was clearly erroneous." Burke v. Butte County, 2002 SD 17, ¶8, 640 NW2d 473, 476 (citing *Vallery,* 1999 SD 142, ¶8, 602 NW2d at 286-87) (additional citations omitted). "Value is a question of fact and the trial court's determination will only be overturned if it is clearly erroneous." West Two Rivers Ranch v. Pennington Co., 1996 SD 70, ¶6, 549 NW2d 683, 686. "When, however, the issue is a question of law, we review the decisions of both the administrative agency and the circuit court *de novo.*" *Burke*, 2002 SD 17, ¶8, 640 NW2d at 477 (citing *Vallery*, 1999 SD 142, ¶8, 602 NW2d at 286-87).

[¶15.]     **Whether the assessment of Apland's rangeland violated Constitutional requirements of equality and uniformity.**

[¶16.]     All real property in South Dakota is to be assessed for tax purposes at its true and full value. SDCL 10-6-33. The following "underlying constitutional provisions must . . . be complied with:

> (1)     the burden of taxation of all property is to be equitable, SD Const. art. XI, § 2
> (2)     agricultural and nonagricultural property may be separated into distinct classes for tax purposes, SD Const. art. VIII, § 15,
> (3)     valuation of property is not to exceed its actual value, SD Const. art. XI, § 2, and
> (4)     taxation is to be uniform on all property in the same class. SD Const. art. VIII, § 15; SD Const. art. XI, § 2."

*Vallery*, 1999 SD 142, ¶12, 602 NW2d at 287 (citing *West Two Rivers*, 1996 SD 70, ¶7, 549 NW2d at 686) (citations omitted). "There is a presumption that tax officials

act in accordance with the law and not arbitrarily or unfairly when assessing property, and the taxpayer bears the burden to overcome this presumption." *Burke*, 2002 SD 17, ¶18, 640 NW2d at 479 (citing *Vallery*, 1999 SD 142, ¶11, 602 NW2d at 287). "To overcome this presumption, the taxpayer must produce sufficient evidence to show the assessed valuation was in excess of true and full value, lacked uniformity in the same class, or was discriminatory." *Id.* (citing *Vallery,* 1999 SD 142, ¶11, 602 NW2d at 287).

[¶17.]	In the present case, Apland did not produce evidence that the assessed value of the property in question was in excess of the true and full value. In fact, Apland produced no evidence as to the true and full value of the property. Instead, Apland asserts that the methodology used by Director to determine the assessment value of Apland's rangeland violated the Constitutional requirements of equality and uniformity. Specifically, Apland asserts that it was error for Director to use sales of land with "appurtenant water rights" without any adjustment for the market value of those water rights. Apland asserts that this error led to his rangeland, which does not have appurtenant and nontransferable water rights, being assessed at a substantially higher value than other rangeland of similar kind and quality.

[¶18.]	It must be noted that while Apland uses the term "appurtenant water rights," it is clear from this record that Apland is actually referring to sales of land with access to water from BFID. Specifically, in discussing sales with BFID water rights, Apland's expert, Jerry Kjerstad, stated that "sales . . . with water rights should not be paired with sales without water rights unless an adjustment for the

water rights could be quantified." He further stated that "the quantity and quality of these [BFID] water rights should be considered . . . . My 40 years of appraisal experience suggests that top dollar value based on soil ratings of irrigated land should not be used or is not comparable to top dollar value of soil rating for properties with no water rights or irrigation." Therefore, the actual question before this Court is whether it was clearly erroneous for Director to use sales of land with access to BFID in his formula when determining that under SDCL 10-6-33.6,[1] the median market value per acre in the Southern Neighborhood deviates by more than ten percent from the county median market value per acre, thus, allowing Director to establish a separate market value per acre for the land within the Southern Neighborhood.

[¶19.]    Apland asserts that before the director calculated the median market values, he should have made adjustments for sales containing "appurtenant water rights" and adjusted those sale prices downwards. Apland asserts that only after the value of those water rights were considered could an accurate median market value per acre be determined.

[¶20.]    Apland is correct. Butte County failed to comply with the Constitutional requirements of equality and uniformity. Here, rangeland without appurtenant and nontransferable water rights within the Southern Neighborhood,

---

1.    SDCL 10-6-33.6 provides:
      If the median market value per acre in an identifiable region within a county deviates by more than ten percent from the county median market value per acre, the county director of equalization may establish a separate market value per acre for the land defined by the director of equalization within that identifiable region.

which includes BFID, was assessed at the same level as rangeland with appurtenant and nontransferable water rights. This produced a result that was neither equal nor uniform.

[¶21.] This Court has addressed the issues of irrigated land, irrigability of land, irrigation systems, and land located within an irrigation project for assessment purposes in the past. We now clarify the appropriate factors.

[¶22.] In *Matter of Butte County*, this Court held that "irrigated land should not be separately classified" and that Butte County could not establish a separate classification for irrigated land. 385 NW2d 108, 111 (SD 1986). This Court noted that "[t]here are approximately 68,000 acres of irrigated land in Butte County, . . . and various methods are used to apply water to the land." *Id*. "The farming practices of the individual landowners are not to be considered when assessing the *land's* value. Farm management decisions cannot change the *earth's* value for taxation purposes." *Id*. at 112 (emphasis in original) (citing Mortenson v. Stanley County, 303 NW2d 107, 111 (SD 1981)). "Likewise, a farm management decision to implement an irrigation system cannot change the *earth's* value for taxation purposes." *Id*. (emphasis in original).

[¶23.] This Court further explained:

> This does not mean, however, that the land's irrigability, whether actually irrigated or not, is not a relevant consideration when assessing agricultural land value. The irrigability of land enhances its value . . . [t]hus, to the extent the land is irrigable, because of its location, soil, terrain, topography, and *appurtenant and nontransferable water rights*, its value may be

assessed appropriately.[2]  However, to the extent irrigability is already considered in the market value analysis, soil survey, etc., it should not be separately reevaluated, for double taxation based on this single factor would result.  Therefore, we reverse that part of the circuit court Judgment which determined that the land's irrigability is not a criteria for an increase in the valuation of agricultural land.

*Id.* (emphasis added) (internal citations omitted).

[¶24.]       In *Vallery*, 1999 SD 142, 602 NW2d 284, the scenario before this Court was whether Butte County had applied valuation procedures consistently or uniformly after it made an initial determination of whether a landowner does in fact irrigate, how many acres are irrigated, the type of irrigation used, and how often the landowner irrigates in determining the value of the land for assessment purposes.  In conducting its evaluation, this Court recognized that

> [t]he South Dakota Department of Revenue . . . assigns a rating to each soil type every year.  The soil rating is based on the production capability of each soil and takes into account irrigability of soil and how irrigability affects the ability of the soil to produce.  Thus, the irrigability of Vallery's agricultural soil has already been taken into account by the Department.

*Id.* ¶14.

[¶25.]       This Court further recognized its prior holding in *Butte County* and that "irrigability of land enhances its value and is a relevant consideration when assessing agricultural land value."  *Id.* ¶16 (citing Kindsfater v. Butte County, 458 NW2d 347, 351 (SD 1990)).  This Court again affirmed that "it is the ability of the

---

2.    *See also* Butte County v. Lovinger, 64 SD 200, 266 NW 127 (1936) (noting that transferable stock in private irrigation companies is personal property and would not be a relevant consideration in determining the land's irrigability).

soil to produce that is to be considered. In the context of irrigation this requires the proper focus to be on whether the land is irrigable, not whether the farming practices in use include irrigation or not." *Id.* Finally, this Court held that the "sale of land located within the irrigation project [BFID], where every year the government guarantees available irrigation water, is not comparable to Vallery's land, [whose irrigation system is supported by water procured from the Belle Fourche River], where the availability of water is often limited." *Id.* ¶18.

[¶26.] In the present case, the methodology undertaken by Director was correct but for his failure to give appropriate consideration and value to appurtenant and nontransferable water rights, specifically BFID water rights. Director was correct to not consider whether rangeland was actually irrigated, a farm management decision. And, while Director did consider each parcel's soil rating and made adjustments based on those ratings, Director's methodology was clearly erroneous because he did not give sufficient consideration to the irrigability of the land with appurtenant and nontransferable water rights. This basic defect in the methodology did not produce an equal or uniform result. Therefore, we reverse and remand for proceedings consistent with this opinion.

[¶27.] GILBERTSON, Chief Justice, and ZINTER and MEIERHENRY, Justices, and MILLER, Retired Justice, concur.

[¶28.] MILLER, Retired Justice, sitting for KONENKAMP, Justice, disqualified.