#28732-a-MES
**2020 S.D. 25**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

PATRICK and ROSE MARY TRASK,                Appellants,

v.

MEADE COUNTY COMMISSION,
ACTING AS MEADE COUNTY
BOARD OF EQUALIZATION, and
the MEADE COUNTY DIRECTOR
OF EQUALIZATION,                                     Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
MEADE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE GORDON D. SWANSON
Retired Judge

\* \* \* \*

JAMES P. HURLEY of
Bangs, McCullen, Butler,
  Foye & Simmons, LLP
Rapid City, South Dakota                         Attorneys for appellants.

KENNETH L. CHLEBORAD of
Office of the Meade County
  State's Attorney
Sturgis, South Dakota                              Attorneys for appellees.

\* \* \* \*

CONSIDERED ON BRIEFS
APRIL 29, 2019
OPINION FILED **05/06/20**

#28732

SALTER, Justice

[¶1.]     Patrick and Rose Mary Trask challenged the valuation of their agricultural land before the Meade County Commission sitting as a board of equalization (the Board), arguing the director of equalization incorrectly applied statutory provisions to determine the land's production value. After the Board granted only partial relief, the Trasks appealed to the circuit court, which affirmed the board's assessed value of their property. The Trasks now appeal the circuit court's decision. We affirm.

## Background

[¶2.]     Patrick and Rose Mary Trask (the Trasks) farm and ranch 11,091 acres of land in southern Meade County. Patrick testified that he has lived and worked on this land his whole life, and with Rose Mary since 1975. The Trasks are predominantly cattle ranchers, but they also grow hay and alfalfa on portions of their property to feed their cattle.

[¶3.]     The assessed value of the Trasks' ranch for 2016 was initially calculated as $539 per acre. However, before mailing the tax assessment to the Trasks, Kirk Chaffee, the director of equalization for Meade County, made discretionary adjustments that reduced the assessment to an average of $519 per acre.

[¶4.]     The Trasks appealed this valuation to the Board. Following arguments from the Trasks, the Board further adjusted the assessment down to an average of $512 per acre. The Trasks, nevertheless, appealed the Board's decision to circuit court.

-1-

[¶5.] The circuit court conducted a trial de novo during which the Trasks acknowledged that the statutory method of assessment requires a determination of their land's "agricultural income value on a per acre basis." SDCL 10-6-33.28. However, they argued that the assessed value for their land was artificially high because it failed to account for how the land is actually used. Patrick testified that he believed 23% of his property should be classified as cropland and 77% should be classified as noncropland. However, Chaffee and the Board (collectively, the Appellees) determined that the Trasks' property is comprised of 61% cropland and 39% noncropland based upon soil classifications Chaffee is obligated to use. Though he cannot change the soil classification for agricultural land, Chaffee testified he can make valuation adjustments based on the unique characteristics of the land to "fine-tune[]" the valuation and ensure the county-wide assessment is "consistent and fair."

[¶6.] The circuit court affirmed the Appellees' tax assessment of the Trasks' property, finding that Chaffee "fully complied with the statutory mandates for assessing agricultural property" and "appropriately took discretionary adjustments as allowed by the statutory scheme for assessing agricultural property." The court further found that the Trasks had not shown that their 2016 tax assessment was "unjust or inequitable" because the assessed valuation of their property did not exceed its actual value and the Appellees had uniformly applied discretionary adjustments to all Meade County agricultural property.

[¶7.] The Trasks raise several issues on appeal, which we consolidate and restate as follows:

1.  Whether the circuit court erred when it determined that the Appellees complied with statutory provisions for valuing agricultural land in their 2016 assessment of the Trasks' property.

2.  Whether the circuit court erred when it determined that the Appellees' 2016 tax assessment of the Trasks' property did not violate provisions of the South Dakota Constitution that require uniform taxation at no more than its actual value.

**Standard of Review**

[¶8.]    "The interpretation . . . and . . . application of statutes to given facts is a question of law (or a mixed question of law and fact) that we review de novo." *Smith v. Tripp Cty.*, 2009 S.D. 26, ¶ 10, 765 N.W.2d 242, 246.  We review "[a]n appeal asserting a violation of a constitutional provision [a]s a question of law." *Stehly v. Davison Cty.*, 2011 S.D. 49, ¶ 7, 802 N.W.2d 897, 899.  "Under the de novo standard of review, we give no deference to the [circuit] court's conclusions of law." *Id.* (quoting *In re Guardianship of S.M.N.*, 2010 S.D. 31, ¶ 10, 781 N.W.2d 213, 218).

**Analysis**

*Assessed Value of Agricultural Land*

[¶9.]    In 2008, the Legislature substantially revised the method of valuing agricultural land for taxation by moving from a market-value approach to a productivity-based model.  *See* SDCL 10-6-33.28 (advising that "beginning on July 1, 2009, agricultural land shall be assessed based on its agricultural income value on a per acre basis").  We have not previously considered a taxpayer challenge under the new agricultural valuation model, codified at SDCL 10-6-33.28 to 10-6-33.37.

[¶10.]      The essence of the change is reflected in the text of SDCL 10-6-33.28, which institutes the term "agricultural income value" and broadly requires that valuation "be determined on the basis of productivity and the annual earnings capacity of the agricultural land."  The statute also provides a method for calculating agricultural income value, which is defined as "the capitalized annual earning capacity on a per acre basis . . . adjusted by an amount that reflects the landowner's share of the gross return."  *Id.*  To determine capacity in this regard, cropland and noncropland is considered separately:

> The capacity of cropland to produce agricultural products shall be based on the income from crops or plants produced on the land.  The capacity of noncropland to produce agricultural products shall be based on cash rents or the animal unit carrying capacity of the land, or a combination of both.

*Id.*

[¶11.]      To account for the cost of planting a crop, the annual earning capacity for cropland is identified as "thirty-five percent of the annual gross return to the land," while noncropland is calculated at "one hundred percent of the annual gross return to the land based on cash rent . . . ."  *Id.*  For both types of agricultural land, "the annual earning capacity shall be capitalized at a rate of six and six-tenths percent to determine the agricultural income value."  *Id.*

[¶12.]      The Legislature placed the responsibility for determining the agricultural income value with the Department of Revenue (the Department).  In this centralized role, the Secretary of Revenue must provide each county director of equalization with annual "agricultural income value[s] for each county as computed pursuant to § 10-6-33.28[']s" productivity-valuation model.  SDCL 10-6-33.31.

[¶13.]    The Department's efforts are guided and informed by the collection and analysis of data. Under the provisions of SDCL 10-6-33.29, the Department must create "a database to determine the agricultural income value of agricultural land by county." Relying on information from "South Dakota State University and, if necessary, the South Dakota Agricultural Statistics Service," the Department's "cropland data may include: acres planted, acres harvested, yield per acre, and statewide crop prices. The noncropland data may include: cash rents,[1] rangeland acres, pastureland acres, rangeland AUM's[2] per acre, pastureland AUM's per acre, grazing season data, and statewide cow and calf prices." SDCL 10-6-33.29.[3]

[¶14.]    Using the database to track the yield history for individual counties and applying statewide commodity prices, the Department develops a specific agricultural income value for cropland. Drawing upon historic cash rents for noncropland within each county, the Department also develops an agricultural

---

1.    In practice, cash rent for noncropland is used exclusively to determine the agricultural income value for noncropland in Meade County. Although the Department could consider other information, such as the grazing capacity of rangeland or pasture, Chaffee testified that this data is not reliably available throughout Meade County, and its use for the Trask ranch would lead to a lack of uniformity in the county-wide equalization process. Though the Trasks maintain their claim that this information should be used for their ranch, they have not challenged the court's decision to accept Chaffee's explanation of the reason it cannot be considered.

2.    An "AUM" is an acronym for an animal unit month and is calculated as the monthly amount of forage necessary to sustain one animal unit (AU), which is a one thousand-pound cow with or without a calf.

3.    The 2020 Legislature amended the text of SDCL 10-6-33.29 to, among other things, require that the data collected "must" include cash rents and calf prices, while allowing that the Secretary of Revenue "may" also collect other noncropland data including "rangeland and pastureland animal unit months per acre, rangeland and pastureland acres, and grazing season data."

income value for noncropland. Sometimes referred to as the Olympic average, the historical data includes the preceding eight years of production, excluding the highest and lowest years. *See* SDCL 10-6-33.29.

[¶15.] These values are, in turn, matched against soil ratings in a specific county. Initially, the Department's income information is matched with optimal soil ratings within the county to establish "top-dollar" values for cropland and noncropland. The productivity for the rest of the soil conditions existing within individual parcels are judged relative to the top-dollar value to obtain an assessed value.

[¶16.] Finally, each county's director of equalization may adjust assessed values based upon the following factors that affect the productivity of a specific parcel:

> (1) The capacity of the land to produce agricultural products as defined in § 10-6-33.2; and
>
> (2) The location, size, soil survey statistics, terrain, and topographical condition of the land including the climate, accessibility, and surface obstructions.

SDCL 10-6-33.31.[4]

[¶17.] Chaffee testified that this adjustment authority allows him to "fine-tun[e]" the assessed value based upon unique circumstances affecting productivity, as long as he documents his adjustments and applies them consistently to similarly situated agricultural land throughout Meade County. In this regard, he has developed a standard adjustment handbook to help ensure he applies adjustments

---

4. Subsection (2) was amended during the 2020 legislative session to reorganize the list of enumerated factors.

evenly. Chaffee testified he applied two "standard" adjustments to the Trasks' property.

[¶18.]     The first was a "crop adjustment." This adjustment generally allows Chaffee to reduce the assessed value of certain areas that include crop-rated soil but cannot practically produce crops due to a myriad of reasons, including topographical features or a small segment size. Chaffee reduces the proportionate assessed values of areas affected by the crop adjustment by 41%, which brings the value of these "croppable" soils down to a level similar to areas with noncrop-rated soils.

[¶19.]     The second adjustment, Chaffee explained, was a "soil adjustment" reduction of 20%. This standard adjustment reduces the value for areas with noncrop-rated soils that cannot sustain grass or forage. These areas included areas of hard-pan ground or channelized soils resulting from seasonal or intermittent water flow.

[¶20.]     The court found Chaffee's testimony factually credible and his explanation of the statutory standards legally sound, concluding that the Appellees' valuation of the Trasks' ranch was "done in accordance with the directives given by the Legislature." We agree.

[¶21.]     Based on data collected by the Department, the Appellees determined the agricultural income value for Meade County agricultural land. Set against optimal soils for cropland and noncropland categories, Chaffee computed the top-dollar production value of $1,040 for cropland and $435 for noncropland. He then evaluated these figures against an array of other soil types before arriving at a full assessed value for the Trask land of $5,980,255, or $539 per acre. Chaffee also

made discretionary crop and soil adjustments that reduced the assessed value to $5,761,395, or $519 per acre. After considering the Trasks' arguments, the Board reduced the assessed value again to $5,680,020, or $512 per acre. From our review of the Appellees' procedure, we find no deviation from the correct statutory course.

[¶22.] The Trasks offer three principal contrary arguments: (1) the Appellees, and therefore the court, did not follow statutory provisions that mandate the consideration of certain data like animal units and climate; (2) the court allowed the Appellees to value the Trasks' land using "fantasy" or "potential" production conclusions that were not realistic given poor soil conditions; and (3) the increase in taxes since 2009 greatly outpaces actual ranch production for a cattle operation.

[¶23.] The first claim requires us to examine the role of SDCL 10-6-33.2 in light of the new productivity model to determine assessed values for agricultural land. The statute provides that:

> In determining the capacity to produce, the county director of equalization and the county board of equalization shall consider yields, the extent to which the land is able to be tilled or is nontillable based upon soil type, terrain, topographical, and surface conditions, and animal unit carrying capacity, as determined by the natural resources conservation service, farm credit services of America, farm service agency, the extension service, and private lending agencies dealing with land production capacities.

*Id.*

[¶24.] If this were the only statute describing the production capacity of agricultural land, the Trasks' argument might well be convincing. However, SDCL 10-6-33.2 is a remnant of the former market-based valuation method. Of course,

the text still says what it says, but subsequently enacted statutes have consigned it to a different role under the new productivity-valuation method.

[¶25.]     The provisions of SDCL 10-6-33.28, for example, exclude SDCL 10-6-33.2 from the list of operative statutes now used to determine productivity by stating, "[t]he productivity of agricultural land and its annual earning capacity shall be based on data collected and analyzed pursuant to this section and §§ 10-6-33.29 to 10-6-33.33, inclusive."  Another unmistakable indicator of the Legislature's purposeful effort to reconceptualize SDCL 10-6-33.2 is its reference contained in SDCL 10-6-33.31 which provides that the assessed value "may be adjusted" based upon the "[t]he capacity of the land to produce agricultural products as defined in § 10-6-33.2 . . ." (emphasis added).

[¶26.]     Construing these statutes together, as we must, we conclude that the provisions of SDCL 10-6-33.2 do not mandate the sole and exclusive list of data sources required to value agricultural land.  *See Olson v. Butte Cty. Comm'n*, 2019 S.D. 13, ¶ 5, 925 N.W.2d 463, 464 (citation omitted) ("[S]tatutes must be construed according to their intent, and the intent must be determined from the statute as a whole, as well as enactments relating to the same subject.")  Instead, the data described in SDCL 10-6-33.28 through SDCL 10-6-33.33 is used to develop a parcel's agricultural income value, which is also "adjusted by an amount that reflects the landowner's share of the gross return" and capitalized at a rate of 6.6%.  SDCL 10-6-33.28.  The resulting assessed value may, as indicated, be adjusted further based upon the considerations listed in SDCL 10-6-33.2.  We therefore conclude that there

is no statutory requirement to determine the assessed value of agricultural land by sole reference to SDCL 10-6-33.2.

[¶27.]     The Trasks' next argument, objecting to what they describe as "fantasy" or "potential" productivity conclusions, states less a claim of legal error and more a disagreement with the Legislature's decision to adopt a production-based valuation method.  Central to the Legislature's determination of productivity is a determination of what the land could produce, not necessarily what it actually produces under its current management.  Certainly, the circuit court did not err by concluding that the Appellees followed the law in this regard.

[¶28.]     Nor do we believe the Trasks' land was erroneously valued based on their theory that the Appellees attributed more productivity to some of their land than justified by its use.  The Trasks are particularly troubled that some of their land was designated as having soils that were "croppable," or capable of sustaining crops, in light of what they believe to be strong factual evidence to the contrary.  However, the relevant question is not whether the Trasks can, in fact, raise crops on these areas, but rather, whether the Appellees operated within their statutory authority to determine a final assessed value.  We conclude they did, but more to the heart of the Trasks' argument, we believe the process associated with valuing their property tempers the effect of their claims, which, based on the record, seem one dimensional.

[¶29.]     The Trasks' ranch includes 11,091 acres in Meade County, which Patrick Trask acknowledges includes some cropland.  In his view, 23% of the ranch is cropland, and 77% is noncropland.  The Appellees, based on the productivity

model, determined 61% of the Trasks' ranch is cropland and 39% is noncropland. However, the difference is not as stark as it seems because the argument overlooks the more comprehensive inquiry the Appellees undertook to determine the *quality* of the cropland. If, in general terms, the Trasks are correct in their assertion that a large portion of their ranch is not suitable for crops, the statutory standards should logically produce values that skew low for cropland, away from the $1,040 top dollar figure in 2016 and closer to an average that approximates noncropland. The record demonstrates that this is, in fact, what happened. Through Chaffee's discretionary crop and soil adjustments and the Board's additional reductions, the Trasks' final assessed value of $512 per acre is not appreciably higher than the top-dollar value for noncropland of $435 per acre.[5]

[¶30.]     The Trasks make a distinct but somewhat related claim of statutory noncompliance, alleging Chaffee should have recategorized portions of their land as noncropland. In this regard, they juxtapose Chaffee's testimony that he is not able to change the soil classification with the text of SDCL 10-6-33.32, which states that "[a]gricultural land shall be divided by the director of equalization into categories, including cropland and noncropland." We think this argument is not sustainable.

[¶31.]     Soil classifications are a function of their type, which is determined by referencing official government soil surveys. Indeed, SDCL 10-6-33.32 further provides that "[e]ach [soil] category shall be divided into classes based on soil

---

5.     The Trasks have not challenged the top-dollar calculations, and although they claimed some of their land was incorrectly described as croppable, they have not argued that the portion of their ranch classified as noncropland contained inferior soils for raising grass and forage to graze cattle.

classification standards developed by the United States Department of Agriculture Natural Resources Conservation Service." The Trasks' argument turns on their evidence of unsuccessful prior crop performance in certain areas classified as cropland, but they do not allege that the soil types were incorrect.

[¶32.] Nor can they point to evidence of prejudice even if Chaffee incorrectly stated he could not alter the soil classification. We have held that "[s]ubstantial compliance with legislative directives is sufficient in determining assessed valuation." *Knodel v. Bd. of Cty. Comm'rs*, 269 N.W.2d 386, 389 (S.D. 1978). Even where a taxing authority fails to "fully comply with statutory mandates . . . a taxpayer cannot avail himself of such invalidity without also showing that the tax levied was unjust and inequitable." *Id.*

[¶33.] Here, the record does not support a determination that the tax levied on the Trasks' ranch was unjust or inequitable. We are not convinced on this record that Chaffee could have, or even would have, changed the soil classification of the Trask land. Also, as indicated above, the Trasks received the benefit of discretionary adjustments from Chaffee and further reductions from the Board to an average per-acre level just above the top-dollar value for noncropland.

[¶34.] Finally, the Trasks argue that their property tax increases have increased dramatically since the implementation of the productivity-based model despite little to no increase in their production. As discussed above, however, the model is based upon the capacity of the land to produce, not its actual production.

Moreover, the Trasks' argument about the wisdom or fairness of the system implicates questions of public policy, not appellate error.[6]

***Constitutional Taxation***

[¶35.]    The South Dakota Constitution requires that "[t]axes shall be uniform on all property of the same class . . . ." S.D. Const. art 11, § 2. Additionally, article 11, § 2 provides that "the valuation of property for taxation purposes shall never exceed the actual value thereof." In application, we acknowledge that "exact 'uniformity and mathematical accuracy in assessments is absolutely impossible, [but] there must be substantial compliance [with constitutional mandates].'" *Stehly*, 2011 S.D. 49, ¶ 9, 802 N.W.2d at 900 (quoting *Codington Cty. v. S.D. Bd. of Equalization*, 433 N.W.2d 555, 558-59 (S.D. 1988)).

[¶36.]    We have previously stated that taxation disputes incorporate "a presumption that tax officials act in accordance with the law and the taxpayer bears the burden to overcome the presumption."[7] *Apland v. Bd. of Equalization for Butte Cty.*, 2013 S.D. 33, ¶ 9, 830 N.W.2d 93, 97 (quoting *Apland v. Butte Cty.*, 2006 S.D. 53, ¶ 16, 716 N.W.2d 787, 792). Taxpayers meet their burden to overcome this

---

6.    The circuit court credited Chaffee's testimony that tax assessments for agricultural land in Meade County were significantly undervalued under the market-based method. However, to ameliorate the impact of exponential increases for cropland values, the Appellees applied the provisions of SDCL 10-6-77, which limits the annual increase in "total taxable value" to 20%.

7.    Pursuant to SDCL 10-3-16, however, we no longer presume that the director of equalization's actual valuation is correct. *See Smith*, 2009 S.D. 26, ¶ 14 n.7, 765 N.W.2d at 248 n.7 ("Although the presumption of correctness was abrogated, we note that [SDCL 10-3-16] did not abrogate the presumption that tax officials act in accordance with the law and not arbitrarily or unfairly when assessing property.").

presumption by "produc[ing] sufficient evidence to show the assessed valuation was in excess of true and full value, lacked uniformity in the same class, or was discriminatory." *Id.* (quoting *Apland*, 2006 S.D. 53, ¶ 16, 716 N.W.2d at 792). "[O]ur scope of review of a trial court's decision in a trial de novo of a tax assessment is to determine whether the findings are clearly erroneous." *Kindsfater v. Butte Cty.*, 458 N.W.2d 347, 348-49 (S.D. 1990).

[¶37.] Here, the Trasks have not established that their assessment transgressed constitutional standards. Chaffee provided undisputed testimony that he applied the same adjustment rules across all similarly situated property in Meade County. In fact, he has standardized his adjustment practices and compiled them in a handbook that he and his staff consult as a resource. Given this record, the Trasks' argument that their assessment lacked uniformity within the same class of property is not sustainable.

[¶38.] Beyond this, the circuit court found that the Trasks' $512 per acre assessment was "substantially less" than the $800 per acre average market value of agricultural land in Meade County. The court's finding was based on Chaffee's report detailing Meade County land sales dating back to 2012. Its determination regarding the constitutionality of the Trasks' valuation is not clearly erroneous. The Trasks' criticism that Chaffee "cherry-picked" the representative transactions to produce an artificially high market value overlooks the fact that Chaffee computed the average value for *all* arm's-length transactions at an even higher figure of $821 per acre.

[¶39.] On appeal, the Trasks make the additional claim that the school land adjacent to their property is "valued and taxed by Appellees at the noncropland value," but their property is assessed as cropland. Though the Trasks did not make this uniform-taxation argument to the circuit court, they now claim that Patrick's trial testimony supports a claim of disparate treatment:

> **Counsel:** [A]re the . . . production of those soils the same on the State land as they are on the deeded land?
>
> **Trask:** I don't have any idea how they could be any different.

[¶40.] We are not convinced that this issue was properly preserved for appellate review. However, even if we were to review the merits of the claim, we think the record is simply insufficient to sustain the merits of the Trasks' argument. At most, Patrick's testimony reflects an assumption that the adjacent school land has the same annual earning capacity as his land and must be assessed uniformly. However, his testimony on this topic, alone, is speculative.[8]

[¶41.] For these reasons, we agree with the circuit court that the Trasks have not met their burden to show that the Appellees' assessment of their property lacked uniformity or exceeded fair market value. We therefore conclude that the circuit court did not err when it found the Trasks' 2016 assessment was constitutional.

## Conclusion

---

8. Patrick did testify that the adjacent school land has a less productive rating for animal unit carrying capacity. However, because of the unavailability of uniform and comprehensive AU data, Chaffee testified he is unable to use it in adjusting the assessed value of noncropland acres.

[¶42.] The circuit court did not err when it found that the Appellees properly followed statutory law in its 2016 assessment of the Trasks' agricultural property and did not violate the State constitution. We understand that the Trasks offer a determined argument that productivity valuation should be based upon the actual use and production of the land. However, our role in this appeal is not to determine this claim of inequity directly. Instead, we must faithfully interpret and apply the statutes enacted by the Legislature for the specific purpose of departing from a market-based method of valuation for agricultural land. Lingering dissatisfaction with the resulting statutory procedure is best addressed by the Legislature, whose fact-finding committees and task force are uniquely situated to carefully study the impact of the productivity model statewide and propose legislative changes or adjustments.[9] We affirm.

[¶43.] GILBERTSON, Chief Justice, and JENSEN, Justice, and SABERS, Circuit Court Judge, and WILBUR, Retired Justice, concur.

[¶44.] SABERS, Circuit Court Judge, sitting for KERN, Justice, disqualified.

---

9. We note that during the 2019 legislative session, the Governor signed Senate Bill 4 into law, requiring the Department of Revenue, in conjunction with South Dakota State University to "study the impact of changes to the methodology of rating soils for purposes of assessing agricultural land." SDCL 10-6-33.38.