#29073-aff in pt & rem in pt-PJD
**2020 S.D. 70**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JEANETTE LUZE, as personal
representative of the Estate of
Charles Edward Luze,                                Plaintiff and Appellant,

         v.

NEW FB COMPANY, f/k/a
FARNER-BOCKEN COMPANY and
ZURICH AMERICAN INSURANCE
COMPANY,                                            Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CAMELA THEELER
Judge

* * * *

SHAWN M. NICHOLS of
Cadwell, Sanford, Deibert,
    & Garry, LLP
Sioux Falls, South Dakota                           Attorneys for plaintiff
                                                    and appellant.


KATELYN A. COOK
DANIEL E. ASHMORE of
Gunderson, Palmer, Nelson,
    & Ashmore, LLP
Rapid City, South Dakota                            Attorneys for defendants
                                                    and appellees.

* * * *

CONSIDERED ON BRIEFS
MARCH 17, 2020
OPINION FILED **12/09/20**

#29073

DEVANEY, Justice

[¶1.]	Charles Luze was killed in a motor vehicle accident at work, after which his employer paid his wife, Jeanette Luze, workers' compensation benefits. Jeanette, as the personal representative of Charles's estate, brought suit against the negligent driver and ultimately settled the claim. The estate also settled a claim against Zurich American Insurance Company (Zurich), the employer's insurer providing underinsured motorist coverage. Zurich is also the employer's workers' compensation insurance carrier. This appeal concerns the circuit court's determination that Zurich is entitled to a statutory workers' compensation lien on 50% of the settlement proceeds received by the estate and that Zurich is able to subrogate against its own settlement payment of underinsured motorist benefits. We remand on issue one and affirm on issue two.

## Factual and Procedural Background

[¶2.]	Charles Luze, age forty-nine, died tragically in a motor vehicle accident on September 14, 2014. Charles was driving a truck for his employer—New FB Company (New FB)—when James Miller ignored a stop sign and drove his semi-truck through an intersection at highway speeds. The collision killed Charles instantly and seriously injured Charles's son, who was also in the truck. Miller pled guilty to criminal charges stemming from the collision.

[¶3.]	At the time of the accident, New FB maintained workers' compensation insurance through Zurich. After Charles's death, Zurich began paying $705 per week in workers' compensation benefits to Jeanette Luze as

Charles's personal representative and sole beneficiary. Zurich also paid $10,000 in funeral expenses.

[¶4.] Jeanette brought a wrongful death suit against Miller in her capacity as the personal representative of Charles's estate and ultimately settled the claim for $898,000. Jeanette also brought suit in federal district court against Zurich to recover under New FB's automobile insurance policy provision relating to underinsured motorists. Zurich disputed that coverage existed, arguing that Charles's vehicle was not a "covered vehicle" under New FB's automobile policy. The federal district court agreed with Zurich, and Jeanette appealed that ruling to the Eighth Circuit Court of Appeals. While the appeal was pending, Zurich and Jeanette settled the coverage claim for $230,000. The estate received a total settlement of $1,128,000 from both Miller and Zurich.[1]

[¶5.] Because Zurich had paid Jeanette workers' compensation benefits owed by New FB, Zurich was entitled to a statutory lien under SDCL 62-4-38 and SDCL 62-4-39 against the portion of the settlement proceeds Jeanette had recovered representing "like damages." However, because Jeanette and Zurich could not agree on the value of the statutory workers' compensation lien, they filed a joint complaint for a declaratory judgment, requesting that the circuit court determine what portion of the settlement proceeds is subject to Zurich's statutory lien and whether Zurich could subrogate against the $230,000 it paid to Jeanette under New FB's underinsured motorist coverage.

---

1. As required by SDCL 21-5-6, Jeanette obtained circuit court approval of the settlement for both the wrongful death claim against Miller's insurer and the underinsured motorist coverage claim against New FB's insurer.

[¶6.]     The circuit court held an evidentiary hearing on the parties' joint request for a declaratory judgment. During the hearing, Jeanette presented testimony from multiple witnesses related to their respective loss of Charles's society and companionship, including his advice, guidance, protection, and assistance. Jeanette also presented expert testimony from Sam Goodhope, a personal injury attorney with experience in wrongful death suits, to opine on the value of Jeanette's wrongful death claim, including economic and non-economic damages.

[¶7.]     In arriving at an estimated value of the estate's wrongful death claim, Goodhope reviewed Jeanette's deposition testimony and an economic loss appraisal prepared in Jeanette's federal suit to recover underinsured motorist benefits. Jeanette had utilized this appraisal, which projected economic losses between $1.2 and $4.5 million, to support her assertion in the federal suit that the recovery from Miller was wholly inadequate, thus implicating the maximum $1 million benefit for underinsured motorist coverage. In light of the significant economic losses related in the appraisal, Goodhope opined "that at a minimum you [would] get a verdict range between" $3 and $6 million in a wrongful death suit brought on the facts of this case. He acknowledged that "non-economics are somewhat ambiguous" but explained that he resolved that ambiguity by "factoring off of the hard damages, the economic damages, the lost wages, the medical expenses." He further explained that a jury's determination of the non-economic damages "can be anywhere from one up to five times" the amount of economic damages or "even greater," depending on the facts of the case. According to Goodhope, the $1.1 million recovery in this

case does not adequately represent the total damages, as the non-economic damages alone would be more than $900,000.

[¶8.]    Zurich did not call any witnesses or offer additional exhibits but did cross-examine Goodhope on his valuation of Jeanette's wrongful death claim and his estimation of the relationship between economic and non-economic damages. At the conclusion of the hearing, the circuit court directed the parties to submit briefs in support of their respective proposed allocations of the settlement proceeds to which Zurich's statutory lien could attach as "like damages."

[¶9.]    In her post-hearing brief, Jeanette proposed alternative avenues by which the court could determine a proper allocation. Jeanette's first proposal suggested that the court allocate 16% as "like damages," calculated by dividing the value of the workers' compensation lien (present value of future benefits plus the benefits already paid) by $4.5 million (the midpoint of Goodhope's estimated "true value" of the claim).[2] Her second proposal suggested a 19% allocation, calculated by dividing the $898,000 settlement obtained from Miller by the asserted $4.5 million midpoint value of the claim. Jeanette did not include the $230,000 settlement amount paid by Zurich in this calculation because, in her view, Zurich was not entitled to subrogate against the amount it paid under New FB's underinsured motorist coverage. Jeanette also pointed to Goodhope's testimony that non-

_____

2.    According to a calculation by the Department of Labor, presented by Jeanette, the present value of the future workers' compensation benefits to be paid over Jeanette's lifetime was $572,062. When this amount is added to the benefits already paid at the time of the hearing ($147,475), the total workers' compensation lien is $719,537.

economic damages could be up to five times greater than economic damages, as an additional basis supporting her suggested 19% allocation of like damages.

[¶10.] In its post-hearing brief, Zurich proposed a 50% allocation of "like damages" based upon dividing $572,062.81 (the present value of the future workers' compensation benefits) by the $1,128,000 total settlement amount recovered by the estate. Zurich further suggested that the allocation could be set as high as 75% based on "the nature of the evidence provided, the weight of the testimony provided, and the $147,475.00 [in workers' compensation benefits] already paid to the [estate] by Zurich[.]"[3] Finally, Zurich asserted that it was entitled to seek subrogation against the entire settlement amount, including the $230,000 it agreed to pay under New FB's underinsured motorist coverage, not just against the amount Jeanette recovered from Miller.

[¶11.] The circuit court issued a memorandum decision and order determining "that Zurich is entitled to a 50% lien on the settlement proceeds." The court indicated that "[t]his figure takes into consideration [Jeanette's] pecuniary loss of Charles' society and companionship, which was significant." The court noted that Charles's "unfortunate and untimely death deprived [Jeanette] of his society and companionship at a time when they were planning for retirement and enjoying their growing family." The court also determined that Zurich could subrogate against the portion of the settlement proceeds Zurich paid to Jeanette under New

---

3. Adding $147,475 to the present value of future workers' compensation benefits ($572,062) equals $719,537, which when divided by the total settlement of $1,128,000 equals 64%. It is not clear how Zurich arrived at its suggestion that the court could allocate as much as 75% toward "like damages."

FB's underinsured motorist coverage because Zurich had paid workers' compensation benefits to Jeanette as New FB's workers' compensation carrier.

[¶12.] The circuit court then adopted the calculation set out in a table attached to Zurich's post-hearing brief to arrive at the total amount of the settlement proceeds to which Zurich is entitled.[4] The judgment entered by the circuit court ordered that Zurich be reimbursed $98,356.22, representing the workers' compensation benefits already paid to Jeanette minus Zurich's pro rata share of the costs and attorney fees expended in obtaining the settlement. The court further ordered that Zurich receive a credit of $87,806 to be offset against Jeanette's future workers' compensation payments.[5]

[¶13.] Jeanette appeals, asserting the following issues:

1. Whether the circuit court erred in concluding that Zurich is entitled to a 50% lien on the $1,128,000 that Jeanette received in settlement proceeds.

---

4. Zurich's calculation table purportedly applied the formula set out in *Zoss v. Dakota Underwriters* (*Zoss I*), 1998 S.D. 23, ¶¶ 16–17, 575 N.W.2d 258, 263. Neither party challenged the court's application of the *Zoss I* formula; therefore, our ruling is confined to the two narrow issues raised by the parties.

5. We note that the court apportioned 13% of the attorney fees and costs to Zurich by dividing the $147,475 Zurich had already paid in workers' compensation benefits by the total settlement proceeds of $1,128,000. The present value of the future workers' compensation benefits was not considered in this calculation. While the parties stipulated to the amount of costs and attorney fees, it is not clear from the record whether they also stipulated to Zurich's share of these fees and costs. Absent a stipulation by the parties, the 13% apportionment does not appear to be consistent with our directive in *Zoss I* that "the employer's share of the fees and costs involved in the employee's third-party recovery should be calculated on [the employer's] total potential liability, *rather than on past benefits actually paid*." *See id.* ¶ 16, 575 N.W.2d at 263 (emphasis added) (citation omitted).

2. Whether the circuit court erred in concluding that Zurich may subrogate against the $230,000 in settlement proceeds Zurich paid to Jeanette under its policy covering underinsured motorists.

## Standard of Review

[¶14.] "We review declaratory judgments as we would any other order, judgment, or decree." *Hanson Farm Mut. Ins. Co. v. Degen*, 2013 S.D. 29, ¶ 14, 829 N.W.2d 474, 477–78 (citations omitted). We therefore review de novo the circuit court's interpretation of a statute. *Liberty Mut. Ins. Co. v. Garry*, 1998 S.D. 22, ¶ 4, 574 N.W.2d 895, 896. However, "our standard of review of factual questions is clearly erroneous." *S.D. Public Entity Pool for Liability v. Winger*, 1997 S.D. 77, ¶ 6, 566 N.W.2d 125, 127.

## Analysis and Decision

### 1. Whether the circuit court erred in concluding that Zurich is entitled to a 50% lien on the $1,128,000 that Jeanette received in settlement proceeds.

[¶15.] Jeanette argues that the circuit court erred in determining that Zurich is entitled to a 50% lien "because Zurich did not present any evidence at the evidentiary hearing" related to "Charles Luze's income, lost earnings, tax returns or other factors that might have been helpful to the [c]ourt in determining how economic and non-economic damages could have and should have been allocated." She acknowledges that she bore the burden of establishing what constitutes "like damages," or perhaps the reverse, what does *not* constitute "like damages," in obtaining a judicial determination of an insurer's statutory lien. However, she contends that Zurich was required to either rebut her evidence or present its own at the evidentiary hearing.

[¶16.]     In *Zoss v. Dakota Underwriters* (*Zoss I*), we examined who has the burden "to ferret out evidence of like damages" and concluded that "the burden is on the employee or spouse to either obtain an express allocation in the settlement or a judicial determination[.]"  1998 S.D. 23, ¶ 13, 575 N.W.2d 258, 262; *see also Zoss v. Dakota Underwriters* (*Zoss II*), 1999 S.D. 37, ¶ 16, 590 N.W.2d 911, 915 (holding that a spouse may present evidence on amount of settlement proceeds representing pecuniary loss).  Here, the circuit court held a full evidentiary hearing and allowed Jeanette to present evidence in support of her valuation of both economic ("like damages") and non-economic damages.  As she bore the burden of proof, Zurich was not required to present independent evidence.  Rather, Zurich could and did rely upon the record evidence, including evidence admitted by Jeanette, in making its argument requesting a different lien amount than that proposed by Jeanette.  Moreover, even if the testimony from Jeanette's witnesses was undisputed by Zurich, the circuit court was not bound to accept it.  *See, e.g.*, *Kusser v. Feller*, 453 N.W.2d 619, 621 (S.D. 1990); *Howe v. Farmers Co-op Creamery of Madison*, 81 S.D. 207, 210, 132 N.W.2d 844, 845 (1965) ("The persuasiveness of evidence may be overcome even though uncontroverted by direct evidence.").

[¶17.]     Jeanette next contends that the circuit court erred in failing to consider the evidence she offered regarding the true value of her wrongful death claim when determining what proportion of the settlement proceeds represents "like damages" (economic damages) under SDCL 62-4-38.  She acknowledges that the statute refers to "recovered damages" but argues that the circuit court erred "[b]y applying this phrase myopically to the facts of this case[.]"  Jeanette claims that

public policy requires courts to look to the true value of the claim because allocation proceedings are "intended to be an equitable exercise[.]" To conclude otherwise, she contends, would allow "an allocation outcome that sharply favor[s] the insurer" and requires "the insured to disproportionally bear the burden of underinsurance."

[¶18.] Under SDCL 62-4-38,

> If an injury for which compensation is payable under this title has been sustained under circumstances creating in some other person than the employer a legal liability to pay damages in respect thereto, the injured employee may, at the employee's option, either claim compensation or *proceed at law against such other person to recover damages* or proceed against both the employer and such other person. However, in the event the injured employee recovers any like damages from such other person, *the recovered damages shall be an offset* against any workers' compensation which the employee would otherwise have been entitled to receive.

(Emphasis added.) The plain language of this statute does not support using the estimated value of a wrongful death claim as the starting number in *calculating the reimbursement* owed for workers' compensation benefits already paid and the offset against future benefits. To the extent Jeanette suggests otherwise, we reject such a suggestion. *See Zoss I*, 1998 S.D. 23, ¶¶ 8–9, 575 N.W.2d at 261 (examining what rights, if any, the insurer had in the *settlement proceeds*); *see also Liberty Mut.*, 1998 S.D. 22, ¶ 3, 574 N.W.2d at 896 (examining the "extent to which Insurer's statutory lien applies against *the settlement*" (emphasis added)); *Dakota Plains AG Center, LLC v. Smithey*, 2009 S.D. 78, ¶ 37, 772 N.W.2d 170, 183 (noting "that it may not be possible to determine the workers' compensation lien prior to knowing the *amount of recovery* from a third party tortfeasor" (emphasis added)).

[¶19.]	However, the focus of Jeanette's argument relates more to the circuit court's failure to consider what she characterizes as the "true value" of the claim *in arriving at an equitable allocation* of non-economic and economic damages. She also contends that the court's 50% lien is "unattached to any of the evidence presented" and "stand[s] ripe for reversal." She asks "that this Court require more—namely, that a [c]ircuit [c]ourt's determination as to what constitutes 'like damages' must be based on some evidence."

[¶20.]	In response, Zurich contends that the record evidence supports the court's determination that Zurich's lien attaches to 50% of the settlement proceeds. It directs this Court to a document in the record offered by Jeanette and admitted during the hearing entitled, "Preliminary Economic Loss Appraisal for Charles Luze." The document summarizes Charles's tax earnings for 2012 through 2014 and his potential lost earning capacity and loss of household production related to various work-life expectancies. According to Zurich, this document and the hearing testimony provided the circuit court with sufficient information to arrive at a 50% statutory lien.

[¶21.]	When, as here, parties resort to a judicial determination of the statutory lien, *Zoss I* requires that the issue be tried "fully and fairly before an impartial fact finder." 1998 S.D. 23, ¶ 14 n.4, 575 N.W.2d at 262 n.4 (citation omitted). We further explained in *Smithey* that the circuit court is required "to separate the damages that were not like damages from 'like damages' after a full evidentiary hearing." 2009 S.D. 78, ¶ 30, 772 N.W.2d at 181 (emphasis omitted).

[¶22.]        Here, in determining Zurich's statutory lien, the circuit court indicated that a 50% lien takes into consideration the evidence presented by the parties. However, the circuit court did not relate in any manner how it arrived at 50% in light of the evidence presented on economic damages in comparison to non-economic damages. While on appeal, Zurich now suggests the court's determination is supported by the economic loss appraisal showing economic losses in an amount greater than the total settlement proceeds, Zurich did not refer to this appraisal when submitting its post-hearing proposals, and the circuit court made no mention of the appraisal in its memorandum decision. In fact, it was Jeanette who offered the economic loss appraisal to support her claim that the settlement proceeds failed to adequately compensate for both economic and non-economic damages. Jeanette had further argued that her expert's testimony suggested a larger multiplier should be applied to the economic damages when calculating the non-economic damages. Yet, in arriving at a 50% lien, the court did not indicate whether it was relying on or rejecting any facet of Goodhope's expert testimony or any other evidence presented.

[¶23.]        More problematic, however, is the court's failure to enter any findings of fact placing *a value* on the "like damages" (economic damages) and non-economic damages, despite noting in its memorandum decision that the parties' interests in this case are adverse and that they proposed different avenues by which the circuit court could determine like damages. And although the court summarized the evidence presented at the hearing, including testimony from the Luze family and from Goodhope, the court did not enter any findings of fact drawn from this

testimony, particularly related to the comparative value of the economic or non-economic damages.

[¶24.] Given the lack of any factual findings *valuing* the economic and non-economic damages, there is no way to evaluate whether the court clearly erred in its assessment of the various factors impacting an equitable allocation. Here, for example, such considerations could include how the workers' compensation benefits (present value of future benefits plus benefits already paid) relate to the estimated economic losses set forth in the appraisal, and in turn, how any losses determined to be "like damages" compare to what the court deemed as "significant" non-economic losses in the context of an estimated total value of the claim far exceeding the settlement amount received.

[¶25.] Admittedly, settlement amounts recovered in wrongful death cases, particularly those involving uninsured or underinsured motorists, may very well fail to rightfully compensate surviving family members for both economic and non-economic losses, and estimating the potential value of a wrongful death claim is a task which even Jeanette's expert conceded was very difficult. Similarly, Zurich acknowledges that while plaintiffs may attempt to maximize the portion of a settlement representing non-economic damages in order to minimize the workers' compensation insurer's lien, the insurer has the opposite goal. Therefore, in valuing "like damages" to determine the statutory workers' compensation lien under SDCL 62-4-38 and SDCL 62-4-39, courts must be cognizant of these competing interests when weighing all of the evidence presented to arrive at a fair and just allocation.

[¶26.]        Here, however, this Court would have to engage in speculation to determine how the circuit court resolved the competing interests advocated by Zurich and the estate in determining that Zurich is entitled to a 50% statutory lien on the settlement proceeds.[6]  As we explained in *AgFirst Farmers Co-op v. Diamond C Dairy, LLC*, "[f]indings must be entered 'with sufficient specificity to permit meaningful review.'"  2013 S.D. 19, ¶ 13, 827 N.W.2d 843, 846 (quoting *DT-Trak Consulting, Inc. v. Prue*, 2012 S.D. 39, ¶ 36, 814 N.W.2d 804, 814).  This is because

_____

6.    The special writing, dissenting on this issue, suggests that we need not speculate as to how the court reached its decision to give Zurich a 50% statutory lien against the settlement proceeds because we can simply look to the evidence in the existing record to determine whether the circuit court's determination was clearly erroneous.  However, in concluding that a 50% lien is supported by "uncontested testimony," the dissent ignores the imprecise nature of the testimony rendered here.  Moreover, the dissent selectively refers to only two pieces of evidence—an economic loss appraisal and Jeanette's expert witness testimony estimating the true value of her claim.  But the circuit court did not even mention the economic loss appraisal and Zurich did not rely upon it to support its suggested calculation.

The dissent also ignores several other facets of the testimony Jeanette presented.  Goodhope, in particular, related a broad range of multipliers such that non-economic damages could be up to five times the economic damages, or sometimes greater, in cases with the "punitive-type facts" present in this case.  Despite the fact that the circuit court simply summarized this testimony from the hearing without making any findings of fact indicating what *value* the court actually placed on "like damages," the dissent deems it sufficient to speculate as to how the court arrived at its one-to-one ratio.  It is the job of "the circuit court to separate the damages that were not like damages from 'like damages' after a full evidentiary hearing." *See Smithey*, 2009 S.D. 78, ¶ 30, 772 N.W.2d at 181 (emphasis omitted).  In doing so, the circuit court must weigh the competing evidence in the first instance and enter findings accordingly.  In fact, the authority cited by the dissent actually supports a remand in circumstances like we have here. *See Goeden v. Daum*, 2003 S.D. 91, ¶ 6, 668 N.W.2d 108, 110 (noting that "[i]t is well-settled law that it is the trial court's duty to make required findings of fact, and the failure to do so constitutes reversible error" (quoting *Grode v. Grode*, 1996 S.D. 15, ¶ 29, 543 N.W.2d 795, 803)).

"[w]ithout findings of fact, there is no way to determine the basis for the [circuit] court's conclusions . . . *or whether [any] findings were clearly erroneous.*" *Id.* (emphasis added) (citation omitted). Such is the situation here. Without underlying findings of fact valuing the economic and non-economic damages, we are unable to meaningfully review the court's allocation determination. Therefore, we remand and direct the circuit court to enter findings of fact detailing how the evidence presented by the parties supports the court's allocation.[7] In doing so, the circuit court is not foreclosed from reconsidering its initial allocation. *See Farlee v. Farlee*, 2012 S.D. 21, ¶ 10, 812 N.W.2d 501, 504 (providing that the circuit court's failure to value disputed property in a divorce decree "requires a remand for the entry of valuation findings and a reconsideration of an equitable division of the property").

> **2.      Whether the circuit court erred in concluding that Zurich may subrogate against the $230,000 in settlement proceeds Zurich paid to Jeanette under New FB's policy covering underinsured motorists.**

[¶27.]      Jeanette contends that the plain language of SDCL 62-4-38 precludes Zurich from subrogating against the underinsured motorist (UIM) benefits it paid to Charles's estate. Under SDCL 62-4-38, if "some other person than the employer" is

---

7.      The dissent further suggests that we are imposing a remedy not requested by Jeanette. On the contrary, Jeanette seeks remand in part because, in her view, the court's 50% allocation determination lacks evidentiary support. She maintains the court simply adopted Zurich's proposal that it be awarded a 50% statutory lien against the settlement proceeds—a number she contends was "plucked out of thin air[.]" Because the circuit court did not enter any findings of fact supporting or even denominating the value of the economic and non-economic damages, we cannot, at this juncture, meaningfully review the basis of the court's decision that Zurich is entitled to a 50% statutory lien.

liable to pay damages to an employee, any damages recovered from "such other person" must be offset from any workers' compensation to which the employee would be entitled. Jeanette argues that because Zurich paid the settlement recovered under New FB's UIM coverage, these settlement proceeds were not obtained from a person other than the employer. Jeanette therefore maintains that Zurich may only subrogate against the amounts she recovered from the tortfeasor (Miller).

[¶28.] Jeanette recognizes our holding in *Kaiser v. North River Insurance Company* that an employer's workers' compensation carrier was entitled to an offset against settlement proceeds the employee received from the employer's UIM coverage provider. 2000 S.D. 15, ¶ 16, 605 N.W.2d 193, 198. However, she contends that her case is distinguishable because in *Kaiser*, the employer's workers' compensation carrier was a different company than the employer's UIM carrier, whereas here, Zurich is both the workers' compensation and UIM coverage provider for New FB.

[¶29.] Jeanette's argument overlooks the Court's reasoning in *Kaiser,* where we relied in part on our analysis in *National Farmers Union Property & Casualty Company v. Bang*, 516 N.W.2d 313 (S.D. 1994), a case involving facts that cannot be distinguished from the case at hand. *Kaiser*, 2000 S.D. 15, ¶ 13, 605 N.W.2d at 197. In *National Farmers*, the employer was self-insured for both workers' compensation and automobile insurance. 516 N.W.2d at 315. On appeal, we examined whether the self-insured employer is entitled to a statutory workers' compensation lien against amounts for which the employer is also liable to an employee for UIM

benefits. *Id.* at 321. Notwithstanding the language of SDCL 62-4-39, referring to damages the employee has recovered "from another person,"[8] we held that the self-insured employer is entitled to "a statutory lien against any self-insured UIM benefits for [workers'] compensation paid." *Id.* *National Farmers* presents the same scenario as here wherein the same "person" (Zurich) is paying both the UIM and workers' compensation benefits. Therefore, Jeanette's argument that Zurich is not entitled to a statutory workers' compensation lien simply cannot be reconciled with our ruling in *National Farmers* and must be rejected.

[¶30.] Jeanette's argument is also untenable in light of our further discussion in *Kaiser*. After acknowledging the split of authority "as to whether workers' compensation liens and offsets are barred or allowed in situations where an employer's UIM policy is involved[,]" we noted that other courts barring an offset in these circumstances have relied upon "statutes referring to 'legal liability,' which sounds in tort, not 'contractual' like an insurer's obligation to pay UIM benefits to the beneficiary." *Kaiser*, 2000 S.D. 15, ¶ 15, 605 N.W.2d at 197–98 (citing *Nat'l Farmers*, 516 N.W.2d at 321). We further acknowledged that our holding in *National Farmers* addressed SDCL 62-4-39, which does not contain a reference to "legal liability," whereas SDCL 62-4-38, the statute we were addressing in *Kaiser*,

---

8. SDCL 62-4-39 provides: "If compensation has been awarded and paid under this title and the employee has recovered damages from another person, the employer having paid the compensation may recover from the employee an amount equal to the amount of compensation paid by the employer to the employee, less the necessary and reasonable expense of collecting the same, which expenses may include an attorney's fee not in excess of thirty-five percent of compensation paid, subject to § 62-7-36."

does contain such language. *Id.* However, we declined to adopt the restrictive reading of this language employed by other courts for public policy reasons.[9] "To allow an employee to retain workers' compensation benefits and UIM policy proceeds would violate South Dakota's public policy against awarding duplicate recovery for the same injury." *Id.* ¶ 16 (citing *Nat'l Farmers*, 516 N.W.2d at 321); *see also Liberty Mut.*, 1998 S.D. 22, ¶ 7, 574 N.W.2d at 897 (noting that "what [the employee] gets is nothing more than actual restoration to himself of what he has lost because of the third person's wrongful act"); *Andreson v. Brink Elec. Const. Co.*, 1997 S.D. 104, ¶ 5, 568 N.W.2d 290, 291 (noting that "[d]ouble recoveries are barred under SDCL 62-4-38").

[¶31.] Nevertheless, Jeanette further argues that "[i]f Zurich is allowed to subrogate against the proceeds of a policy for which it received the premiums, Zurich will receive a windfall." On the contrary, this argument fails to account for the fact that Zurich paid out a sum of money under the UIM insurance contract for which it received premiums. Her argument also runs afoul of our prohibition against the employee (or his survivors) receiving a double recovery for the same damages.

[¶32.] Finally, the Court in *Kaiser* observed that had the negligent driver been adequately insured, the employer's workers' compensation carrier clearly would have been entitled to a lien against amounts recovered under the driver's

---

9. In addition to the public policy reasons, we explained that "[i]t would be inconsistent to state that employers and insurers have a right to reimbursement for past benefits under SDCL 62-4-39, but are barred from offsetting for future benefits under SDCL 62-4-38." *Kaiser*, 2000 S.D. 15, ¶ 16, 605 N.W.2d at 198.

liability policy. 2000 S.D. 15, ¶ 17, 605 N.W.2d at 198. There is no reason to reach a different result when a driver is not adequately insured. Although the settlement payment in this instance technically comes from the employer's UIM carrier, "it was occasioned by the liability" of the tortfeasor for the employee's injuries. *See id.* (quoting *Walkup v. Wabash Nat'l Corp.*, 691 N.E.2d 1282, 1284 (Ind. Ct. App. 1998)); *accord Montedoro v. City of Asbury Park*, 416 A.2d 433, 436 (N.J. Super. Ct. App. Div. 1980). Thus, as we noted in *Kaiser*, "[i]n essence, uninsured motorist insurance acts to pay the damages owed by the uninsured driver." 2000 S.D. 15, ¶ 17, 605 N.W.2d at 198 (citation omitted).

[¶33.] The same rationale applies here regardless of the fact that Zurich provided New FB's workers' compensation coverage and automobile insurance coverage. As one court explained, the fortuitous "interrelationship between [uninsured motorist] coverage and the compensation lien should not turn upon coincidences that do not go to the heart of the legal relationship." *Montedoro*, 416 A.2d at 436. Rather, "[t]he fundamental policy expressed [in allowing a lien] is to limit an injured employee to that which the common law entitles him as long as that amount is greater than worker's compensation benefits for the same injury; it assumes such recovery to represent the most to which he is entitled." *Id.* For these reasons, the circuit court properly allowed Zurich to subrogate against the amount it paid in underinsured motorist benefits.

[¶34.] Affirmed in part and remanded in part.

[¶35.] GILBERTSON, Chief Justice, and KERN, Justice, concur.

[¶36.] JENSEN, Justice, concurs in part and dissents in part.

[¶37.]        SALTER, Justice, dissents in part and concurs in result in part.

JENSEN, Justice (concurring in part and dissenting in part).

[¶38.]        The circuit court's decision allocating "like damages" requires no guesswork or "speculation" by this Court.  We should affirm the circuit court's determination because it is supported by the evidence in the existing record and is not clearly erroneous.

[¶39.]        Jeanette argues, "the Circuit Court's *finding* that 50% of [her] settlement proceeds constitute 'like damages' was *clearly erroneous*."  (Emphasis added).  She makes no claim that the circuit court's findings are inadequate, nor does she ask this Court to remand for additional findings.  Yet the majority opinion concludes that a remand for additional findings is necessary because "we are unable to meaningfully review the court's allocation determination."  (Majority Opinion, ¶ 26).  A review of the record shows otherwise.

[¶40.]        Goodhope testified to a typical multiplier of one to five for non-economic damages as compared to economic damages.  Equating "like damages" to non-economic damages, he explained that "non-economics are somewhat ambiguous and so, you'll have factoring off of the hard damages, the economic damages, the lost wages, the medical expenses . . . .  And so, juries are going to give a factor of that."  Goodhope testified that there were several favorable facts, or "enhancement factors," for Jeanette, but Jeanette's counsel did not elicit any opinion or testimony from Goodhope about where her case fell along the one to five multiplier range.  However, Goodhope offered his opinion, given Jeanette's economic loss appraisal

placing economic damages in the range of $1.2 million to $4.5 million, that the likely value of the case if it were tried was between $3 million and $6 million.

[¶41.]     The circuit court's determination that 50% of the damages were like damages is supported by the uncontested testimony presented on behalf of Jeanette, and our review for clear error is complete.  After all, our task is not to scrutinize the record looking for what we believe to be the *right* answer, but rather to determine if there is evidence to support the finding that 50% of the damages were economic in nature.  The deferential clear error standard permits relief on appeal only "when we are definitely and firmly convinced a mistake has been made."  *Lakota Cmty. Homes, Inc. v. Randall*, 2004 S.D. 16, ¶ 9, 675 N.W.2d 437, 440.

[¶42.]     Remanding this case for more findings and informing the circuit court that it "is not foreclosed from reconsidering its initial allocation" serves no purpose under our standard of review.  (Majority Opinion, ¶ 26).  This is not a case where the circuit court rejected Goodhope's allocation range or other testimony presented by Jeanette.  *Cf. Goeden v. Daum*, 2003 S.D. 91, ¶ 7, 668 N.W.2d 108, 110 (remanding for findings of fact when there was disputed testimony on whether the facts established the legal elements for stalking because "there [was] no way to determine the basis for the trial court's conclusions that stalking had occurred or whether those findings were clearly erroneous").

[¶43.]     The circuit court drafted a fifteen-page opinion detailing the facts of the accident, the family's relationship with Charles, and Goodhope's testimony about the potential recovery on the case, before arriving at a 50% "like damages" determination.  The circuit court fulfilled its role by making an allocation decision

that is supported by the law and the evidence. We need to fulfill our role by affirming that decision under our standard of review. I would, therefore, affirm the circuit court on both issues.

SALTER, Justice (dissenting in part and concurring in result in part).

[¶44.]     I join Justice Jensen's dissent on the first issue presented in this appeal. For the reasons he expresses, I would affirm the circuit court's determination under our deferential clear error standard.

[¶45.]     I am in agreement with the other members of the Court to affirm on the second issue, but I do so principally on the basis of *stare decisis*. I am not convinced that our earlier decisions in *Kaiser* and *National Farmers* contain a satisfactory statutory exegesis of SDCL 62-4-38 or SDCL 62-4-39 to allow for enduring reliability. Both statutes were enacted long before our UIM statute, and their textual provisions strongly suggest that an employer asserting a workers' compensation lien or offset against UIM proceeds paid under its automobile policy cannot be the "other person" from whom the employee recovered. *See Benson v. Sioux Falls Medical and Surgical Clinic*, 62 S.D. 324, 252 N.W. 864, 866 (1934) (considering a predecessor to SDCL 62-4-38 which included the "some other person than the employer" phrase); *Streff v. State Farm Mut. Auto. Ins. Co.*, 2017 S.D. 83, ¶ 22, 905 N.W.2d 319, 325 (Zinter, J., dissenting) (noting the Legislature first began requiring UIM coverage in 1975).

[¶46.]     Indeed, the text of SDCL 62-4-38 seems to specifically exclude the employer from consideration as the person against whom the employee recovered damages:

> If an injury for which compensation is payable under this title has been sustained under circumstances *creating in some other person than the employer* a legal liability to pay damages in respect thereto, the injured employee may, at the employee's option, either claim compensation or proceed at law against such other person to recover damages or proceed against both the employer and such other person. However, in the event the injured employee *recovers any like damages from such other person*, the recovered damages shall be an offset against any workers' compensation which the employee would otherwise have been entitled to receive.

(Emphasis added.).[10]

[¶47.] Beyond this, a more fundamental question remains about whether a contractual obligation to pay UIM benefits satisfies SDCL 62-4-38's threshold requirement of a "legal liability" to pay damages. In *Kaiser*, we acknowledged that "'legal liability' . . . sounds in tort[]" and not contract, but we overlooked this distinction, citing public policy grounds and an inclination to align the result in that case with the holding in *National Farmers*. *Kaiser*, 2000 S.D. 15, ¶¶ 15-16, 605 N.W.2d at 197-98. However, neither of these bases seems an adequate alternative to construing the text as enacted by the Legislature.

[¶48.] Notwithstanding this, we have an institutional aversion to overturning precedent because adhering to a body of decisional law promotes stability and constancy in the law. *See Pearson v. Callahan*, 555 U.S. 223, 233, 129 S. Ct. 808, 816, 172 L. Ed. 2d 565 ("Stare decisis promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.") (citation

---

10. Zurich's purely statutory ability to seek an offset appears to be no different than New FB's. *See* SDCL 62-1-2 (defining "employer" to include "the employer's insurer so far as applicable.").

and internal quotation omitted). Of course, this reluctance must yield when we are convinced our earlier decisions were wrong, but we should approach the question of whether to depart from precedent with great caution and restraint. *See id.* ("Although '[w]e approach the reconsideration of [our] decisions . . . with the utmost caution,' '[s]tare decisis is not an inexorable command.'") (citation and internal quotations omitted); *see also Brekke v. Crew*, 43 S.D. 106, 178 N.W. 146, 153 (1920) ("Consistency purchased by adherence to decisions at the sacrifice of sound principle is dearly bought.") (citation omitted).

[¶49.]     Here, Jeanette has not asked us to overrule *Kaiser* and *National Farmers*. In her reply brief, she argues *Kaiser* is distinguishable and does not cite *National Farmers* in any of her submissions. In my view, the continuing soundness of these two decisions is not squarely presented, and for that reason, we are left only with our precedent which controls the subrogation issue we confront here.