#30254-aff in pt & rev in pt-MES
**2024 S.D. 10**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

UHRE REALTY CORPORATION and
UHRE PROPERTY MANAGEMENT
CORPORATION,                                                    Plaintiffs and Appellants,

v.

BENJAMIN TRONNES and
LESLIE TRONNES,                                                 Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JOSHUA K. HENDRICKSON
Judge

\* \* \* \*

JONATHAN A. HEBER
ABIGALE M. FARLEY of
Cutler Law Firm, LLP
Sioux Falls, South Dakota                     Attorneys for plaintiffs
                                              and appellants.


KATELYN A. COOK of
Gunderson, Palmer, Nelson
   & Ashmore, LLP
Rapid City, South Dakota                      Attorneys for defendants
                                              and appellees.

\* \* \* \*

ARGUED
NOVEMBER 9, 2023
OPINION FILED **02/07/24**

#30254

SALTER, Justice

[¶1.] Benjamin and Leslie Tronnes sought the help of realtor Joshua Uhre and his real estate company to sell their Rapid City home when they relocated to Colorado Springs. They also entered into a property management agreement with Uhre's separate property management company, authorizing Uhre to lease and manage the property in the event they were unable to sell it. The property did not sell during the term of the listing agreement, but Uhre did obtain a tenant who agreed to lease the home. After the listing agreement expired, the Tronneses communicated directly with their tenant and eventually sold the property to him. Uhre believed his realty company was entitled to a commission as a result of the sale and also asserted that his property management company was entitled to a management fee for the entirety of the lease agreement despite its early termination. On behalf of both companies, Uhre commenced this action against the Tronneses and the tenant alleging, among other things, breach of the listing agreement, breach of the management agreement, and civil conspiracy. The Tronneses filed a counterclaim alleging that Uhre and his companies had tortiously interfered with their business expectation with the tenant.

[¶2.] The circuit court granted the tenant's motion for summary judgment and also granted the Tronneses' motion for summary judgment concerning their breach of the management agreement claim. The Tronneses prevailed at a court trial on Uhre's other claims but not their counterclaim for tortious interference. The circuit court also held the Tronneses were entitled to attorney fees under the terms of the listing agreement. On behalf of his realty and property management

-1-

companies, Uhre appeals the court's adverse decisions with the exception of the order granting the tenant's motion for summary judgment. We affirm in part and reverse in part.

## Factual and Procedural Background

[¶3.]     Joshua Uhre is a Rapid City realtor who owns Uhre Realty Corporation (URC) and Uhre Property Management Corporation (UPM). He assisted Benjamin and Leslie Tronnes with purchasing a home when they moved to Rapid City in 2014. When the Tronneses decided to move to Colorado Springs in 2019 to pursue new employment opportunities, they again contacted Uhre to assist them, this time with selling their property.

[¶4.]     The parties entered into two agreements that are at issue in this appeal. The first was an Exclusive Listing and Agency Agreement (Listing Agreement) between the Tronneses and URC, commencing on May 1, 2020, and expiring on October 31, 2020. Under the terms of the Listing Agreement, URC was entitled to a commission equal to 5% of the purchase price if either URC procured a purchaser for the property during the term of the Listing Agreement or if the property was the subject of an option that was exercised during the term of the Listing Agreement. The Listing Agreement also contained a 180-day tail period following its expiration, which allowed URC to earn a 5% commission if the property was sold within that time to a purchaser to whom URC had shown the property. The tail period ran until April 29, 2021.

[¶5.]     The second agreement was an Agreement to Manage and Lease Real Estate (Management Agreement) between the Tronneses and UPM, which

permitted UPM to lease and manage the property as an alternative to selling it. The term of the Management Agreement ran from August 16, 2019 to September 1, 2020, and it was automatically renewable for annual periods unless it was terminated upon giving 30-days' written notice. The Management Agreement provided UPM with a management fee of 10% of the gross monthly rental payments.

[¶6.] In July 2020, David Pifke and his girlfriend were looking to relocate from Las Vegas to Rapid City because of closures during the COVID-19 pandemic. They were not, however, interested in purchasing a home immediately. Pifke's girlfriend discovered the Tronneses' property from an online listing and submitted a lease application. Uhre contacted Pifke for a showing and, although Pifke's inquiry related to leasing the property, Uhre explained that the rental arrangement could be transformed into a contract for sale at any time.

[¶7.] In August 2020, Uhre sent a draft 12-month lease agreement to Pifke. The proposed lease contained a provision that terminated the lease and required Pifke to move on 30-days' notice in the event the home was sold. In response, Pifke offered to lease the property for 18 months and asked whether the Tronneses would agree to not show or list the property during the term of the lease "in the event we don't move forward as the purchaser." For an increase in the monthly rental fee and the longer 18-month term, the Tronneses agreed to the arrangement, and Pifke and his girlfriend began living in the home on October 1, 2020.[1]

---

1. The property had been leased previously to different tenants who expressed some interest in purchasing the property, but a sale never came to fruition.

[¶8.]     But despite the potential for a future purchase, Pifke made it clear he was not interested in purchasing the property at that time. Pifke explained he did not have money available for a down payment, and he and his girlfriend wanted to experience a South Dakota winter before deciding whether to make Rapid City their permanent home.

[¶9.]     Nevertheless, Uhre discussed the possibility of purchasing the property with Pifke, at the Tronneses' request, even after the October 31, 2020 expiration of the Listing Agreement. On November 6, Leslie texted Uhre, "So second week in December you'll get them to sign a contract for deed or buy the house?!? Lol, but seriously!" And a couple weeks later Benjamin similarly texted Uhre, asking, "Did you have the chance to discuss a possible purchase?" Uhre assured Benjamin he would gauge Pifke's "thoughts on purchasing" and did so, but Pifke felt no inclination to purchase the property. At this point, the Tronneses had not yet communicated directly with Pifke about purchasing the property.

[¶10.]     In January 2021, the home the Tronneses had been renting in Colorado Springs became available for sale. This further motivated them to sell their Rapid City property. While they were back in town, the Tronneses visited the house unannounced and introduced themselves to Pifke. During their discussion, they expressed their desire to sell the property to Pifke and followed up in an email, stating, "If we can do this without a realtor, we could sell to you for $475,000." During their in-person conversation, the Tronneses also informed Pifke that they were no longer under an exclusive listing agreement with Uhre. Pifke explained to the Tronneses what he had previously explained to Uhre—that he might be

interested in purchasing the property in the future, but at the time, he did not have financing available for a down payment.[2] The Tronneses continued to periodically ask Pifke if he had reconsidered purchasing.

[¶11.] In March 2021, Benjamin reiterated the $475,000 offer in an email to Pifke, but this time, Benjamin told Pifke that the offer would expire on May 1, at which point the Tronneses would list the property for sale. Pifke questioned the May 1 deadline, stating in an email response that Benjamin's proposed listing was "at odds" with the Tronneses' agreement to not list the property during the 18-month lease term. Benjamin quickly acknowledged his mistake, "You are right. My apologies. We'll discuss that with [Uhre]."[3]

[¶12.] Even though Benjamin had admitted his mistake, the email concerned Pifke. He feared the Tronneses were going to breach the lease agreement, so to ensure he would not be displaced, Pifke decided to purchase the property and began making arrangements for financing. He ultimately made an offer directly to the Tronneses of $500,000, which was $25,000 over their asking price. After further negotiation regarding closing credits, proration of rent, and personal property in the home, the parties executed a purchase agreement, dated April 30, 2021—one day after the expiration of the 180-day tail period.

---

2. A few days after the Tronneses' drop-in, Uhre made an unsolicited inquiry to Pifke about potentially purchasing, but Pifke responded that his position remained unchanged.

3. The Tronneses did not contact Uhre.

[¶13.] Uhre learned of the purchase agreement in a May 4 email from Benjamin, advising that the Tronneses had "entered into a private sales agreement with our tenants and plan to close on June 1." Uhre congratulated Benjamin and asked, "How do you want to handle the balance of the lease and commission?" Benjamin responded, "What do you mean by commission?"

[¶14.] Prior to the closing date, Uhre contacted the closing company and asserted that he was the procuring cause of the sale and was entitled to a "professional fee of 5% of the purchase price plus tax." The Tronneses and Pifke closed on the sale of the property, and the amount representing Uhre's disputed commission claim was, and still is, held in escrow pending a resolution.

[¶15.] Uhre commenced this action on behalf of URC and UPM, naming the Tronneses and Pifke and alleging five causes of action: the Tronneses' breach of the Listing Agreement; the Tronneses' breach of the Managing Agreement; Pifke's breach of the Managing Agreement; civil conspiracy to breach the agreements; and a request for a declaration that Uhre is owed "a commission, sales tax, and transaction fee under the Listing Agreement." The Tronneses asserted a counterclaim, seeking declaratory relief and alleging tortious interference with a business expectancy.

[¶16.] All parties filed motions for summary judgment. Pifke's motion was granted in its entirety, and that order has not been appealed. The circuit court denied the Tronneses' motion for summary judgment regarding URC's Listing Agreement breach claim and their tortious interference counterclaim. However, the court granted the Tronneses' motion for summary judgment as to UPM's breach of

the Management Agreement claim. URC and UPM voluntarily dismissed their civil conspiracy claim.

[¶17.] The remaining claims were tried to the circuit court, which received testimony from Uhre, Pifke, and Benjamin along with a number of exhibits. After trial, the court entered a judgment, which incorporated its findings of fact and conclusions of law and denied relief for all of URC's claims against the Tronneses as well as the Tronneses' tortious interference with a contract claim against URC and UPM.[4] The circuit court also determined that the Listing Agreement allowed the Tronneses to recover attorney fees as prevailing parties. The Tronneses subsequently submitted an application for attorney fees, to which URC and UPM objected. Following the notice of appeal, the court conducted a hearing on the Tronneses' application for attorney fees and entered an order staying a specific award of attorney fees pending the outcome of this appeal.

[¶18.] URC and UPM appeal, raising three issues for our review, restated as follows:

1. Whether the circuit court erred by holding the Tronneses did not breach the Listing Agreement.

2. Whether the circuit court erred by granting the Tronneses' motion for summary judgment on UPM's claim for breach of the Management Agreement.

3. Whether the circuit court erred by determining the Listing Agreement authorized attorney fees to the Tronneses as prevailing parties.

---

4. The judgment stated that the claims were "dismissed with prejudice," but the circuit court considered the claims on the merits following the court trial and did not dismiss them, as is evidenced by its findings and conclusions. Under the circumstances, we read the court's dismissal reference to simply mean that it was denying relief.

## Analysis and Decision

### *Listing Agreement*

[¶19.] "Findings of fact are reviewed for clear error and will only be overturned 'when we are definitely and firmly convinced a mistake has been made.'" *Hiller v. Hiller*, 2018 S.D. 74, ¶ 19, 919 N.W.2d 548, 554 (quoting *Lakota Cmty. Homes, Inc. v. Randall*, 2004 S.D. 16, ¶ 9, 675 N.W.2d 437, 440). But "[u]nder the de novo standard of review, we give no deference to the circuit court's conclusions of law." *Trask v. Meade Cnty. Comm'n*, 2020 S.D. 25, ¶ 8, 943 N.W.2d 493, 496 (quoting *Stehly v. Davison Cnty.*, 2011 S.D. 49, ¶ 7, 802 N.W.2d 897, 899).

[¶20.] Likewise, "[c]ontract interpretation is a question of law reviewed de novo." *Coffey v. Coffey*, 2016 S.D. 96, ¶ 7, 888 N.W.2d 805, 808 (citation omitted). A contract is breached where there is "(1) an enforceable promise; (2) a breach of the promise; and (3) resulting damages." *Bowes Constr., Inc. v. S.D. Dep't of Transp.*, 2010 S.D. 99, ¶ 21, 793 N.W.2d 36, 43. When ascertaining the terms of a contract, we interpret them "according to [their] plain and ordinary meaning[.]" *Berkley Reg'l Specialty Ins. Co. v. Dowling Spray Serv.*, 2015 S.D. 35, ¶ 22, 864 N.W.2d 505, 512 (citation omitted).

[¶21.] The provision of the Listing Agreement addressing compensation states, in relevant part, as follows:

> If a purchaser is procured for the property by [URC], by any other cooperating broker, by the Seller, or by any other person at the price and upon the terms stated above, or at any other price or upon any other terms accepted by the Seller during the term of this Agreement or if exchanged or optioned during the term of this contract and said option is exercised, or if within 180 days after the expiration of this agreement, the property is sold to

any person to whom the property was shown the Seller agrees to pay compensation as stated above.

[¶22.]	Based on this language, URC presents three arguments in support of its contention that the circuit court erred when it determined URC was not entitled to a commission from the sale of the Tronneses' home: (1) URC procured Pifke as a purchaser; (2) Pifke and the Tronneses agreed to an option for the property; and (3) the Tronneses breached the implied covenant of good faith and fair dealing. We address each argument in turn.

### 1.	*Procurement*

[¶23.]	Generally, "[w]here a broker has been employed to find a purchaser for property, and has found and produced to the owner a purchaser ready, able, and willing to purchase on the terms of the listing, the broker has earned the agreed compensation." *Ericson v. Ebsen*, 52 S.D. 97, 216 N.W. 860, 861 (1927); *see also Howie v. Bratrud*, 14 S.D. 648, 86 N.W. 747, 748 (1901) (holding that to earn a commission, an "agent employed to procure or find a purchaser for real estate . . . must show by competent evidence that he has found a purchaser for such real estate who is at the time ready, willing, and able to purchase such real estate").

[¶24.]	The Listing Agreement also obligated the Tronneses to pay URC a commission even if the price and terms varied from the Listing Agreement as long as the other price and terms were "accepted" by the Tronneses. But in either event,

URC must have procured the purchaser "during the term of this agreement[,]" and that, simply put, did not occur.[5]

[¶25.] While the relationship between the Tronneses and Pifke originated with Uhre, he did not procure a ready, willing, and able purchaser within the term of the Listing Agreement. Instead, Uhre procured Pifke only as a *tenant*. Uhre may well have mentioned the topic of purchasing the property during the term of the Listing Agreement, but Pifke's testimony and the circuit court's corresponding findings make clear that URC did not procure Pifke as a ready, willing, and able purchaser prior to the October 31, 2020 expiration of the Listing Agreement.

[¶26.] In fact, the evidence points decidedly to the opposite conclusion, as the circuit court's findings indicate. During Uhre's discussions with Pifke, including those immediately after the expiration of the Listing Agreement, Pifke explained he was *not* in a financial position to buy the property and, in any event, wanted to experience a South Dakota winter before purchasing a home.

[¶27.] URC's argument to the contrary is based upon a different view of the facts, but we are unable to reweigh the evidence and must review the circuit court's findings for clear error. Here, the court found, in a series of individual findings, that Pifke began plans to purchase the property in March 2021—long after the

---

5. In its conclusions of law, the circuit court stated that "URC would be entitled to compensation if, during the term of the Listing Agreement, a purchaser was procured for the Property *and an offer was accepted by the Seller*." (Emphasis added.) URC challenges this interpretation, contending that procurement under the Listing Agreement does not require an offer. We think any distinction in this regard is not consequential because URC did not procure Pifke as a buyer who was ready, willing, and able to purchase the property during the term of the Listing Agreement.

Listing Agreement had expired—when Benjamin mistakenly advised him that the Tronneses planned to list the house. These findings are supported by the record and are not clearly erroneous.

[¶28.] URC also offers a definition of "procure" that it believes supports the claim that the Tronneses breached the Listing Agreement by not paying it a commission. In URC's view, Uhre was a "procuring cause" of the sale to Pifke because he "originate[d] or cause[d] a series of events which, without a break in their continuity, . . . produce[d] a purchaser ready, willing, and able to buy on the owner's terms." 12 C.J.S. *Brokers* § 258.

[¶29.] But this definition does not assist URC because, even if we accept it, the evidence does not establish an unbroken causal chain between Uhre's contact with Pifke and his ultimate decision to purchase the property. As indicated, Pifke eventually became a ready, willing, and able purchaser, but it was *after* the term of the Listing Agreement.[6]

[¶30.] And it was also after the Tronneses began communicating directly with Pifke, trying to persuade him to purchase their home. Until March 2021, Pifke was not ready, willing, or able to purchase the property. It was only after he began to

---

6. On cross-examination at trial, Uhre acknowledged that the Listing Agreement expired on October 31, 2020, and he admitted that he had never asked the Tronneses to enter into another agreement, stating, "I felt we had 18 months or 16 months of grace to allow the tenant to enjoy the property and potentially at any time buy it." When asked if a listing agreement is required for an agent to represent a party in this type of real estate relationship, Uhre responded, "Not necessarily." The Tronneses' counsel offered to approach Uhre with the statute requiring such an agreement, to which Uhre responded, "You can, but there's also implied rules as well that I know that have taken place so . . . ."

believe that the Tronneses would not honor their agreement to hold the property off the market for the entire 18-month lease term that Pifke began making arrangements to purchase the home. The events that led Pifke to this conclusion were based entirely upon separate and direct communications with Benjamin Tronnes that did not involve Uhre. The circuit court's findings in this regard are supported by the record, and they establish that Uhre's involvement with Pifke did not begin an unbroken causal chain of events that led naturally to his decision to purchase the Tronneses' property.

### 2. Option

[¶31.] Next, URC challenges the circuit court's conclusions that "[t]he [l]ease was not an option contract[,]" and as a result, "the Property was not optioned within the term of the Listing Agreement." URC contends that the Tronneses' agreement to not list or show the property during Pifke's 18-month lease in exchange for an increased monthly rental fee constituted an option to purchase the property, which entitled URC to a commission.

[¶32.] However, the claim is unsustainable. To begin, the email correspondence relating to the Tronneses' agreement not to list or show the property for 18 months cannot serve as the basis for any sort of collateral agreement between Pifke and the Tronneses. The lease agreement contains an unambiguous provision that states "[a]ll understandings between the parties are incorporated in this Agreement,]" which is "a final, complete and exclusive expression of their Agreement" and cannot be "contradicted by evidence of any prior

agreement[.]"[7] We have similarly held that "when contract language is unambiguous, extrinsic evidence is not considered because the intent of the parties can be derived from within the four corners of the contract." *Black Hills Excavating Servs., Inc. v. Constr. Servs., Inc.*, 2016 S.D. 23, ¶ 10, 877 N.W.2d 318, 322 (quoting *Vander Heide v. Boke Ranch, Inc.*, 2007 S.D. 69, ¶ 37, 736 N.W.2d 824, 835).

[¶33.] But even if the email correspondence could be considered, it would not entitle URC to a commission because it was not an option contract. An option is a "contract by which an owner of real property agrees with another person that the latter shall have the privilege of buying the property at a specified price within a specified time, or within a reasonable time[.]" *Ziegler Furniture & Funeral Home, Inc. v. Cicmanec*, 2006 S.D. 6, ¶ 17, 709 N.W.2d 350, 355 (quoting *Kuhfeld v. Kuhfeld*, 292 N.W.2d 312, 314 (S.D. 1980)). Additionally, an option contract, like any contract, requires separate consideration. *Id.* ¶ 15, 709 N.W.2d at 354.

[¶34.] Here, the terms necessary for a valid option contract are not present. Even viewed charitably, the email does not purport to grant an exclusive right to purchase the property, and it does not state a specific price. The fact that the property was not listed or shown during the lease period was part of a bargain that allowed Pifke greater privacy and enjoyment during his tenancy, but there was no promise to sell the home only to Pifke at a particular price. Nor was there consideration for an option under these circumstances.

---

7. UPM is actually designated as the lessor in the lease agreement though the parties appear to acknowledge that the Tronneses were, in fact, the lessors. The parties' appellate briefs have not suggested that this aspect of the lease agreement is significant to our review.

[¶35.]     And beyond this, any theoretical option was not exercised during the term of the Listing Agreement as required by the compensation provision set out above.  An "option is exercised when the optionee accepts the irrevocable offer, and an enforceable contract of sale is created."  *Advanced Recycling Sys., LLC v. Se. Props., Ltd. P'ship*, 2010 S.D. 70, ¶ 12, 787 N.W.2d 778, 783.  Here, Pifke's offer and the purchase agreement were signed in April 2021, well after the October 31, 2020 expiration of the Listing Agreement.

### 3.     *Implied Covenant of Good Faith and Fair Dealing*

[¶36.]     "Every contract contains an implied covenant of good faith and fair dealing that prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract."  *Zochert v. Protective Life Ins. Co.*, 2018 S.D. 84, ¶ 22, 921 N.W.2d 479, 486 (quoting *Schipporeit v. Khan*, 2009 S.D. 96, ¶ 7, 775 N.W.2d 503, 505).  "Lack of good faith may be evidenced by various conduct, such as 'evasion of the spirit of the deal; abuse of power to determine compliance; and, interference with or failure to cooperate in the other party's performance.'"  *Id.* (quoting *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 845 (S.D. 1990)).

[¶37.]     URC makes four arguments that the Tronneses breached the implied covenant of good faith and fair dealing.  First, it argues the Tronneses breached the covenant by requesting Uhre's assistance with the sale of the property after the Listing Agreement had expired and without intending to compensate him for his efforts.  But the circuit court found that "Ben had no intent to circumvent URC's receipt of a commission" and that "[n]o evidence was presented to support the claim

that the Tronneses lacked good faith in their interactions with URC[.]" These findings are not clearly erroneous.

[¶38.] URC also asserts that the Tronneses' "threatening" emails and unannounced visit to Pifke establish a breach of the implied covenant of good faith and fair dealing. In particular, URC argues the Tronneses induced Pifke to offer $25,000 above the asking price by threatening to terminate the lease early. But, again, this factual argument is contrary to the circuit court's findings. The court made a finding based on what it found to be credible testimony that Pifke offered $25,000 over the asking price because he wanted to avoid a bidding war. This is, in fact, what Pifke stated during his testimony, and the court's findings are not clearly erroneous.

[¶39.] URC's final two bad-faith arguments are similar. First, it asserts the Tronneses breached the implied covenant of good faith and fair dealing when they failed to inform Uhre of their communications with Pifke. Particularly, URC suggests the Tronneses' proposal to sell the property to Pifke for $25,000 less if they did it "without a realtor" is evidence of "a secret and deceitful intention to avoid communicating with Uhre" and an apparent attempt to skirt the tail period. URC also contends the Tronneses breached the covenant of good faith when they stated in a March 2021 email to Pifke that they would speak with Uhre but did not do so.

[¶40.] But, legally, the Tronneses were not obligated under their then-expired Listing Agreement to inform Uhre of their communications with Pifke, and their 2021 proposal for a private sale could not be viewed as secret and deceitful. And, factually, the circuit court found the Tronneses were trying to sell the property as

quickly as possible to assist them with the purchase of their Colorado home. Benjamin, who the circuit court found credible, testified that he had not even thought about the tail period and was solely focused on selling his Rapid City home before the scheduled June 1, 2021 closing for the Tronneses' Colorado home.[8] This was the motivation for the Tronneses, the court concluded, and it could not be viewed as bad faith toward URC.[9] We perceive no clear error in these findings, and we affirm the circuit court's judgment.

***Management Agreement***

[¶41.] "We review a circuit court's entry of summary judgment under the de novo standard of review." *Zochert*, 2018 S.D. 84, ¶ 18, 921 N.W.2d at 486 (citation omitted). Our review of a grant or denial of summary judgment requires the determination of "whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law." *Burgi v. E. Winds Ct., Inc.*, 2022 S.D. 6, ¶ 15, 969 N.W.2d 919, 923 (citation omitted). It is well-settled that "[w]e view the evidence most favorably to the nonmoving party and resolve reasonable doubts against the moving party." *Id.* (citation omitted).

---

8.  Benjamin is an attorney and testified that he was "embarrassed" that he was so unfamiliar with the terms of the Listing Agreement.

9.  At oral argument, counsel for the Tronneses admitted that the timing of the purchase agreement "doesn't look good" coming, as it did, one day after the tail period ran. But the circuit court found the timing of the purchase agreement and the expiration of the tail period to be unrelated based upon Benjamin's testimony.

[¶42.]     The circuit court did not err when it granted summary judgment on UPM's claim for breach of the Management Agreement. UPM points to the absence of findings or conclusions in supporting its contention of error, but when ruling on a motion for summary judgment, "findings of fact and conclusions of law are unnecessary." *Piner v. Jensen*, 519 N.W.2d 337, 339 (S.D. 1994) (citation omitted).

[¶43.]     Additionally, UPM argues the circuit court erred when it concluded there were no genuine issues of material fact. But as the Tronneses note, UPM's arguments do not raise factual questions related to a breach issue but, rather, assert a legal claim that the circuit court erred in interpreting the Management Agreement.

[¶44.]     For instance, UPM argues that it is entitled to 10% of the gross monthly rent for all 18 months, which it contends accrued upon consummation of the lease because the language of the Management Agreement states that compensation is "due and payable on demand." This argument asks us to interpret contractual language; it does not present us with a factual issue. But regardless, it is not persuasive.

[¶45.]     The relevant provisions of the Management Agreement state as follows:

> Owner recognizes Broker as agent in any negotiations relative to said property or any part thereof, which may have been initiated during the term hereof, and if consummated, shall compensate [UPM] in accordance with the rates hereinafter set forth. Such compensation is due and payable on demand and may be deducted from gross receipts.
>
> . . .

> This agreement is automatically renewable, upon expiration, for annual periods unless terminated by either party giving 30 days' written notice to the other party in advance of such termination date. However, the termination of this agreement shall not affect the right of Broker to receive leasing commissions or fees which have accrued on the date specified in such notice and have not been paid.

[¶46.] We interpret the phrase "due and payable on demand" to describe the function by which UPM was paid; UPM became immediately entitled to—and could demand—its compensation for one month's rent upon receipt of that month's rent. And because UPM collected the rent on behalf of the Tronneses, the Management Agreement authorized it to first deduct its 10% management fee before distributing the remaining funds to the Tronneses.

[¶47.] UPM puts more stock in the phrase "on demand" than is warranted. It contends that the agreement's text would allow UPM to demand its management fee for all 18 months' worth of rent upon consummation of a lease. But UPM fails to account for the fact that this only includes *monthly* rents that have been received. Under a plain interpretation of the text, UPM cannot be entitled to compensation based on rental payments that had not been received and could not demand compensation for all 18 months' worth of rent simply because the lease had been consummated.

[¶48.] UPM also asserts that there is a genuine issue of material fact as to the Management Agreement's termination date. But the termination date of the Management Agreement is not a factual issue; its 12-month term was subject to automatic renewal unless it was terminated or expressly not renewed.

[¶49.]     Here, the Management Agreement was originally executed prior to Pifke's tenancy in August 2019 when another tenant was renting the home. The Management Agreement expired on September 1, 2020, but it automatically renewed for another year. The Tronneses then gave 30-days' written notice of their intent to terminate the agreement, and it was terminated in June 2021, well in advance of its scheduled expiration and potential renewal. The text of the Management Agreement entitled UPM to a management fee for the rent that had accrued up to "the date specified in the notice" of termination. Thus, UPM is only entitled to 10% of the monthly rent that had accrued through June 3, 2021, which it has received.

[¶50.]     Finally, UPM argues that a breach of the covenant of good faith and fair dealing is a factual question not appropriate for summary judgment. But the arguments it advances do not establish disputed issues of material fact that would preclude judgment as a matter of law for the Tronneses on the Management Agreement breach claim.

[¶51.]     For example, UPM argues the Tronneses breached the implied covenant of good faith and fair dealing by terminating the lease prior to its expiration date. But the success of this argument hinges on a favorable outcome for UPM on its "accrual" argument. Because, as we held above, all 18 months' rent did not accrue upon the "consummation" of the lease, we cannot conclude that the Tronneses breached the implied covenant of good faith and fair dealing.

[¶52.]     Nor does the fact that the Tronneses did not have a discussion with Uhre regarding termination of the Management Agreement before providing

written notice constitute evidence of bad faith that would preclude summary judgment. As the Tronneses note, they complied with the Management Agreement by giving UPM 30-days' written notice of their intent to terminate the agreement. The Tronneses did not breach the covenant of good faith and fair dealing; they simply exercised their contractual right. Therefore, we affirm the circuit court's grant of summary judgment for the Tronneses on UPM's claim.

***Attorney Fees***

[¶53.] Generally, parties are responsible for their own attorney fees. *Stern Oil Co., Inc. v. Brown*, 2018 S.D. 15, ¶ 44, 908 N.W.2d 144, 157 (citation omitted). But a court may award attorney fees if "authorized by the parties' agreement or by statute." *Id.* (citation omitted). Where the availability of attorney fees is derived from a contract, its terms control. *Id.* (citation omitted).

[¶54.] It is well-settled that it is the contract's text that determines the parties' intentions. *Detmers v. Costner*, 2023 S.D. 40, ¶ 22, 994 N.W.2d 445, 454 (citation omitted). And where a contract is unambiguous, "it is our duty to interpret it and enforce it as written." *Edgar v. Mills*, 2017 S.D. 7, ¶ 28, 892 N.W.2d 223, 231 (citing *Discover Bank v. Stanley*, 2008 S.D. 111, ¶ 17, 757 N.W.2d 756, 762).

[¶55.] The circuit court erred in holding the Tronneses were entitled to attorney fees under the terms of the Listing Agreement, which provides:

> The Broker and Seller, as parties to this agreement, agree that *a party in breach* of any of the covenants, promises or obligations arising under this contract shall be liable and responsible for attorney's fees and costs that may result from enforcement thereof as against the party in breach.

(Emphasis added.)

[¶56.] The circuit court held the Tronneses were entitled to attorney fees based on its finding that they were prevailing parties. But as URC asserts, the text of the Listing Agreement does not authorize an award of attorney fees to the prevailing party; it authorizes fees to the *nonbreaching* party in the event of breach. URC was not "a party in breach," and attorney fees were not authorized.

[¶57.] Nevertheless, the Tronneses assert that "when considering the entirety of the contract and the intent behind the same," we should affirm the circuit court's conclusion that the Tronneses are entitled to attorney fees. But we need not look any further than the agreement's text to determine the parties' intent.

[¶58.] The Tronneses further argue that interpreting the text literally to mean "that only [URC] had the potential to recover fees in this instance, despite failing in [its] claims against the Tronneses" would be an absurd result. *See Nelson v. Schellpfeffer*, 2003 S.D. 7, ¶ 12, 656 N.W.2d 740, 743 (stating we will not interpret a contract in such a way that "would produce an absurd result"). But limiting an award of attorney fees to instances of contractual breaches based upon the unambiguous provisions of the Listing Agreement can hardly be characterized as absurd. *See In re Implicated Individual*, 2021 S.D. 61, ¶ 25, 966 N.W.2d 578, 585 (stating that "our standard for relative absurdity should be high").

## Conclusion

[¶59.] Because the circuit court's findings were not clearly erroneous, we affirm the court's judgment against URC on its breach of the Listing Agreement claim. Likewise, we affirm the circuit court's grant of summary judgment for the Tronneses on UPM's breach of the Management Agreement claim. However,

#30254

because the Listing Agreement did not authorize attorney fees, we reverse the circuit court's determination that the Tronneses are entitled to them.

[¶60.]        JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.