#30480-aff in pt & rev in pt-MES
**2025 S.D. 1**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

DUANE REMINGTON and
MELODY REMINGTON,                                   Plaintiffs and Appellants,

v.

WILD BILL'S CAMPGROUND AND
RESORT, LLC, KEITH GRIMM,                           Defendants,

and

BRYAN IVERSON,                                      Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JEFFREY R. CONNOLLY
Judge

\* \* \* \*

MICHAEL S. BEARDSLEY of
Beardsley, Jensen & Lee, Prof. LLC
Rapid City, South Dakota                            Attorneys for plaintiffs and
                                                    appellants.


JEFFREY G. HURD
GREGORY J. ERLANDSON of
Bangs, McCullen, Butler,
   Foye & Simmons, L.L.P.
Rapid City, South Dakota                            Attorneys for defendant and
                                                    appellee.

\* \* \* \*

ARGUED
JUNE 5, 2024
OPINION FILED **01/02/25**

#30480

SALTER, Justice

[¶1.] Duane and Melody Remington purchased a campground and allege that they began to notice various defects on the property after closing. The Remingtons sued both the seller and the limited real estate agent who represented the parties in the transaction, alleging various claims against each. The real estate agent moved for summary judgment on the claims against him, and the circuit court granted his motion, determining, in part, that a property disclosure statement was not required because the sale was a commercial transaction. The Remingtons appeal. We affirm in part, reverse in part, and remand for further proceedings.

**Factual and Procedural Background**

[¶2.] In April 2017, Duane and Melody Remington were nearing retirement and searching for a project to undertake. The couple had stayed in RV parks before and "thought it would be fun to own one." Duane and Melody had seen an online listing for Wild Bill's Campground (the Campground) near Galena, and, while driving one day, they decided to stop. The Campground was on 12.74 acres and contained 98 campsites, a handful of which consisted of sleeping cabins. There were 84 firepits, two drive bridges, and a main building. Inside the main building were living quarters and a bar and restaurant with an attached deck.

[¶3.] The Remingtons found the owner of the Campground, Keith Grimm, inside the restaurant and spoke with him. He confirmed that the property was for sale, and when the Remingtons asked "what kind of money he made," they allege Grimm responded that he made "good money," about $235,000 in the previous three-and-a-half-month camping season. Grimm had purchased the Campground in

-1-

2005 and first listed it for sale in 2008. He typically took the Campground off the market during the summer camping season and listed it again in the off-season, each time with the assistance of real estate agent Bryan Iverson, who had been a friend of Grimm's brother.

[¶4.] The Campground was located in a commercially zoned area of Lawrence County and was listed in the multiple listing service under the "BUSINESS/INDUSTRY" classification. The online listing provided a detailed description of the Campground, including the living quarters and a new drive bridge. The listing stated that purchasing the Campground was an "excellent opportunity to own a campground, bar & grill." The living quarters included a kitchen, laundry area, living room, a main floor bedroom, full bath, and three additional bedrooms and a half-bath in the basement.

[¶5.] After their first meeting with Grimm, the Remingtons walked through the property twice more and decided to purchase the Campground. The Remingtons and Grimm met with Iverson at his office to formalize the terms they had negotiated. The Remingtons executed an agency agreement, which explained, in part, that Iverson was a dual agent who represented both Grimm, as the seller, and the Remingtons, as purchasers.

[¶6.] Grimm and the Remingtons executed a purchase agreement which stated a purchase price of $899,000 to be paid under the terms of a contract for deed. Prior to closing a couple of weeks later, the Remingtons visited the Campground property approximately three additional times but never with Iverson. Both the purchase agreement and the contract for deed stated that the property was

being sold "as is," and the Remingtons did not have any inspections completed. Nor did the Remingtons ask to review the Campground's financial information before executing the contract for deed.

[¶7.] After purchasing, the Remingtons claim they began to notice problems with the property. For instance, the basement of the main building experienced water penetration, and Duane Remington discovered that mold had been growing on the walls behind sheet rock and wood paneling that Grimm had installed. As a result, the Remingtons had to close the bar and restaurant. Grimm had known of the water penetration issues and the mold, but he did not disclose this information to the Remingtons.

[¶8.] Further, after closing, the Remingtons discovered that a portion of the restaurant's deck was encroaching 1.5 feet into an adjacent right-of-way in violation of federal regulations. In November 2016, Grimm had received a notice from the Department of Transportation of this encroachment and was told to "remove this portion of the deck out of the Right-of-Way by October 1, 2017." He never did; nor did he inform the Remingtons of the violation.

[¶9.] The Remingtons also began receiving letters from the local fire marshal informing them that the Campground's fire pits did not comply with county code. Grimm had been aware of the noncompliance, but he did not share this information with the Remingtons.

[¶10.] Further, the property listing stated that two of the Campground's bridges had recently been rebuilt. They had, in fact, been rebuilt seven and nine years prior to the sale, and the Remingtons questioned the accuracy of the

information after two motorhomes fell through these bridges during the time the Remingtons operated the Campground.

[¶11.] Finally, the Remingtons contend that Grimm and Iverson made misrepresentations about the financial condition of the Campground. For instance, when the Remingtons asked Iverson "if this place was worth it[,]" they allege Iverson responded that Grimm "made 240, $245,000 a year . . . and we would be fine." Duane acknowledged that Grimm had related a similar figure that Duane understood to reflect gross revenue, not net profit. In any event, the Remingtons claim that the information was inaccurate based upon the Campground's performance during the time they operated it.[1]

[¶12.] The Remingtons operated the Campground for only one season before commencing this action against Iverson, Grimm, and Grimm's limited liability company (collectively, Grimm) in January 2018. The complaint alleged six claims.

[¶13.] Count 1 alleged that Iverson and Grimm failed to complete the seller's residential disclosure form required by SDCL 43-4-38 and, consequently, failed to disclose "structural and foundational defects within the residence and surrounding property." Counts 2–4 of the complaint alleged that the defendants had engaged in fraudulent misrepresentation, fraudulent concealment, and willful and wanton misconduct, all in connection with an enumerated list of alleged deficiencies that included basement flooding in the main building, mold, the right-of-way issues, the noncompliant fire pit rings, inaccurate representations of past financial

---

1. The Remingtons also allege Grimm misrepresented the value of a mower which Grimm listed as worth $8,500. The Remingtons later discovered a purchase order for the mower which indicated it initially cost $6,700.

performance, and the condition of the bridges.  Count 5 of the Remingtons'

complaint alleged that Iverson had breached his fiduciary duty, and count 6

asserted a breach of the agency agreement.

[¶14.]     Grimm filed a counterclaim that alleged the Remingtons defaulted

under the contract for deed.  In their reply to the counterclaim, the Remingtons

acknowledge that they relinquished possession of the Campground back to Grimm.

[¶15.]     The procedural history of the case in the circuit court reveals two

distinct phases.  Initially, Iverson sought summary judgment on all of the

Remingtons' claims.  However, in a letter to the court, Grimm's counsel advised that

Grimm did not take a position regarding Iverson's motion, and Grimm did not

further participate in Iverson's summary judgment proceeding.

[¶16.]     Iverson presented two principal arguments to the circuit court.  First,

he asserted there was no evidence that he knew of any of the defects alleged by the

Remingtons.  And, second, Iverson claimed he was under no obligation to advise the

Remingtons to seek a statutory seller's disclosure form from Grimm because it was

not required for the sale of commercial property, only residential real property.  The

Remingtons argued the disclosure statement was required because the presence of

living quarters meant that the Campground sale involved residential real property.

As to the other allegations of nondisclosure, the Remingtons cited Iverson's

familiarity with the Campground property and argued a jury should determine

what, if any, knowledge he possessed.

[¶17.]     The circuit court granted Iverson's summary judgment motion after

concluding that it did not "think the disclosure statute, the residential disclosure

statute applies." The court did not specifically mention the common law claims alleging Iverson's nondisclosure. Even though the claims against Grimm remained unresolved, the parties stipulated that the court could certify its summary judgment order as final under the provisions of SDCL 15-6-54(b) (Rule 54(b)). The Remingtons then appealed, but we dismissed the appeal by order after concluding that the court's bare certification did not comply with our decisions applying Rule 54(b).

[¶18.]    In a second phase of litigation featuring the Remingtons' claims against Grimm and Grimm's counterclaim, the circuit court considered two motions for summary judgment, both filed by Grimm. First, Grimm sought summary judgment on the counterclaim relating to breach of the contract for deed. Though Grimm had reacquired possession of the Campground, he sought a quitclaim deed from the Remingtons to extinguish any claims they might have to the Campground or its improvements. The Remingtons ultimately delivered a quitclaim deed to Grimm before a hearing was set on the motion.

[¶19.]    Grimm filed a second summary judgment motion relating to the Remingtons' nondisclosure claims. He claimed, as Iverson had, that he was not required to furnish a statutory seller's disclosure form for the Campground because it was not residential real property. He also argued that the property had been sold "as is" under the express terms of the contract for deed and that the Remingtons' nondisclosure claims were the result of their lack of due diligence and decisions not to obtain professional inspections. The circuit court granted partial summary

judgment on the statutory seller's disclosure claim using the same view as it had with Iverson's claim—it did not apply to the sale of commercial real property.

[¶20.] However, the circuit court denied Grimm's motion as it concerned the common law nondisclosure claims and set a trial date to resolve what it determined were genuine issues of material fact. But there ultimately was no trial; the parties stipulated to an order dismissing the remaining claims against Grimm with prejudice. With the resolution of all of the claims, the Remingtons have again appealed, challenging the circuit court's decision to grant Iverson's motion for summary judgment.[2]

## Analysis and Decision

### *Summary judgment*

[¶21.] "We review a circuit court's entry of summary judgment under the de novo standard of review." *Uhre Realty Corp. v. Tronnes*, 2024 S.D. 10, ¶ 41, 3 N.W.3d 427, 438 (citation omitted). "Our review of a grant or denial of summary

---

2. Iverson filed a notice of review challenging the circuit court's denial of his motion for attorney fees and costs. On its face, the notice of review was outside of the time limit provided in SDCL 15-26A-22, and we issued an order directing Iverson to show cause why the notice of review should not be dismissed for lack of appellate jurisdiction. The parties responded with a stipulation in which they agreed to allow consideration of the untimely notice of review. However, because our jurisdiction is unaffected by waiver or stipulation, the ultimate question of jurisdiction remained, and we issued an order indicating we would consider the jurisdictional issue with the case. We also indicated a willingness to reconsider our precedent that holds that SDCL 15-26A-22's time limit is jurisdictional. *See Lake Hendricks Improvement Ass'n v. Brookings Cnty. Plan. & Zoning Comm'n*, 2016 S.D. 17, 877 N.W.2d 99. Despite this, the parties have not submitted any legal argument on the notice of review jurisdictional issue in their briefs. Under the circumstances, we perceive an insufficient basis to revisit our *Lake Hendricks* decision, which we now apply to dismiss Iverson's notice of review.

judgment requires the determination of 'whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law.'" *Id.* (quoting *Burgi v. E. Winds Ct., Inc.*, 2022 S.D. 6, ¶ 15, 969 N.W.2d 919, 923). We view the evidence "most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party." *Scotlynn Transport, LLC v. Plains Towing & Recovery, LLC*, 2024 S.D. 24, ¶ 17, 6 N.W.3d 671, 676 (citation omitted).

[¶22.] The party opposing the summary judgment motion, however, "must present specific facts showing that a genuine, material issue for trial exists." *Id.* (citation omitted). "[T]hose resisting summary judgment must show that they will be able to place sufficient evidence in the record at trial to support findings on all the elements on which they have the burden of proof." *Chem-Age Indus., Inc. v. Glover*, 2002 S.D. 122, ¶ 18, 652 N.W.2d 756, 765 (citation omitted).

### *A real estate agent's duty*

[¶23.] The Remingtons' theory of liability against Iverson is an indirect one. Iverson, himself, was not the seller and was not obligated to provide a disclosure form. *See Saiz v. Horn*, 2003 S.D. 94, ¶ 11, 668 N.W.2d 332, 336 (noting that SDCL 43-4-38, "of course, imposes no duty on the buyers' agent"). Rather, the Remingtons assert Iverson breached his duty to advise them that Grimm was required to provide a completed seller's disclosure form. But in order to be liable for a breach, a duty must exist.

[¶24.] A real estate agent owes a duty to his or her client as a fiduciary and under a professional standard of care. These duties can be sourced to both our common law and our statutes.

[¶25.] In *Saiz v. Horn*, we stated that real estate agents owe their principals a fiduciary duty and "are expected to advise their principals on the rules and procedures involved in a real estate transaction." 2003 S.D. 94, ¶¶ 11–12, 668 N.W.2d at 336. They must "exercise reasonable care, skill, and diligence in performing the transactions entrusted to them[.]" *Id.* ¶ 13, 668 N.W.2d at 337 (citation omitted); *see also Barta v. Kindschuh*, 518 N.W.2d 98, 100 (Neb. 1994) ("A real estate agent owes his principal a fiduciary duty to use reasonable care, skill, and diligence in performing his obligations and to act honestly and in good faith." (citation omitted)).[3]

[¶26.] Iverson offers two arguments in his effort to avoid a duty to the Remingtons. First, he claims that his status as a limited agent will not support the imposition of a duty. But this argument is foreclosed by the provisions of SDCL 36-21A-140, which state that a limited agent owes a duty to, among other things, "exercise reasonable skill and care for the client" and "perform the terms of any written agreement made with the client[.]" The definition of "agency agreement" in SDCL 36-21A-1 explains that a written agreement between parties "creates a fiduciary relationship between the broker and client."

---

3. In several instances in *Saiz*, we did not expressly identify the source of a real estate agent's duty. At times, we refer to an agent's fiduciary duty and, in other instances, we seem to refer to an agency agreement or the common law professional negligence standard of care.

-9-

[¶27.]        In his second argument, Iverson claims that the Legislature's enactment of SDCL 36-21A-138 has effectively abrogated our decision in *Saiz*. In relevant part, SDCL 36-21A-138 states that an agent does not owe "any fiduciary duty or obligation to a customer." But the Remingtons were not "customer[s]" who are defined in SDCL 36-21A-1(9) as "any party to a real estate transaction who does *not have an agency relationship* with a[n] [agent][.]" (Emphasis added.) The Remingtons, of course, did have an agency relationship with Iverson as established through their executed agency agreement.[4] They were his clients, not customers, and he owed them a fiduciary duty.

[¶28.]        Our 2010 opinion in *Jacquot v. Rozum* further supports this continuing, post-*Saiz* view of an agent's common law fiduciary duty. 2010 S.D. 84, 790 N.W.2d 498. Although the existence of an agent's fiduciary duty was not directly at issue in *Jacquot*, we upheld a jury instruction, taken directly from *Saiz*, that described a limited agent as a fiduciary who was "bound to exercise reasonable care, skill, and diligence in performing the transactions entrusted to them[.]" *Id.* ¶ 22, 790 N.W.2d at 506.

[¶29.]        Though Iverson plainly owed the Remingtons a duty as their real estate agent, whether that duty obligated him to advise them about a seller's disclosure statement for the Campground is not so plain. Under ordinary

---

4.      This fact represents a critical distinction between this case and *Saiz* where we noted the *absence* of a "signed representation agreement" in the record. 2003 S.D. 94, ¶ 3 n.1, 668 N.W.2d at 334 n.1. And our suggestion in footnote 4 that the recently enacted SDCL 36-21A-138 could conceivably apply to absolve the real estate agent defendant of a fiduciary duty should be read in this context. *See id.* ¶ 11 n.4, 668 N.W.2d at 336 n.4.

circumstances involving property that is unquestionably residential real estate, a buyer's agent has a duty to inform his or her client that a seller is required to furnish a property disclosure statement to the buyer. *Saiz*, 2003 S.D. 94, ¶¶ 11–14, 668 N.W.2d at 336–37. But where, as here, the property at issue features both residential and commercial uses, the requirement for a seller's disclosure statement implicates an unsettled legal question.

[¶30.] In order to understand Iverson's potential liability under this theory, we must consider whether Grimm was required by statute to furnish a seller's disclosure statement. If Grimm was not obligated to provide a disclosure statement, as the circuit court determined, then there is no basis for the Remingtons' claim that Iverson breached his fiduciary duty to them. However, if Grimm was obligated to provide a seller's disclosure statement, there are factual questions concerning Iverson's breach that remain unresolved.

***Property disclosure statements for residential real property***

[¶31.] "When confronted with an issue of statutory interpretation, we 'necessarily begin[] with an analysis of the statute's text.'" *Stockwell v. McCook Cnty. Bd. of Comm'rs*, 2024 S.D. 2, ¶ 21, 2 N.W.3d 236, 241 (quoting *In re Implicated Individual*, 2021 S.D. 61, ¶ 16, 966 N.W.2d 578, 583). And when the statute's language "is clear, certain, and unambiguous, there is no reason for construction, and this Court's only function is to declare the meaning of the statute as clearly expressed." *Healy Ranch, Inc. v. Healy*, 2022 S.D. 43, ¶ 29, 978 N.W.2d 786, 795–96 (citation omitted). Where the text is clear, we "simply read the text and apply it." *Implicated Individual*, 2021 S.D. 61, ¶ 28, 966 N.W.2d at 586. We

review a court's interpretation of a statute de novo. *Luze v. New FB Co.*, 2020 S.D. 70, ¶ 14, 952 N.W.2d 264, 269 (citation omitted).

[¶32.]        A property disclosure statement is required for the sale of residential real property. SDCL 43-4-38.[5]  Under the provisions of SDCL 43-4-37(3), "residential real property" is defined as "all residential real property consisting of not more than four family dwelling units, all of which are contained in one structure[.]"  Under an uncomplicated reading of this definition, the sale of *any* real property containing four or fewer family dwelling units contained in one structure is subject to the residential disclosure statement requirement.

[¶33.]        Iverson argues that a property disclosure statement was not required for the Campground because the sale was for a commercial business, while the Remingtons assert the living quarters necessitated one for the entirety of the Campground.[6]  But we do not read SDCL 43-4-37(3)'s definition of residential real property in such absolute terms.  The definition's language does not indicate that it either applies to all property within a real estate transaction or none of it.  Surely,

---

5.     The first part of SDCL 43-4-38, as is relevant here, states, "The seller of residential real property shall furnish to a buyer a completed copy of the disclosure statement before the buyer makes a written offer."

6.     Iverson offers other, related arguments, such as the Campground was advertised as commercial property, was situated in a commercially zoned area, and the living quarters were not being used as a residence at the time the Remingtons agreed to purchase the Campground.  But none of these facts, even though they are undisputed, are material because they are disconnected from the definition of residential real property under SDCL 43-4-37(3), which focuses only upon the number of family dwelling units and their inclusion in a single structure. *See R.J. Miller, Inc. v. Harrington*, 618 N.W.2d 460, 464 (Neb. 2000) (stating that the statute applicable at that time "makes no mention of the buyer's primary purpose for the purchase").

had the Legislature intended such an all-or-nothing result, it could have chosen to do so. *See Lucero v. Van Wie*, 1999 S.D. 109, ¶ 10, 598 N.W.2d 893, 896 (refusing to "supply omitted language" to a statute in order to achieve a particular result).

[¶34.]     As it is, the Legislature provided a straightforward definition of residential real property that courts can easily apply without the necessity of characterizing real estate. And, simply put, there is no textual support for the idea that the applicability of SDCL 43-4-38 is determined by divining the primary use of the real property. *Compare* Neb. Rev. Stat. § 76-2,120 (defining residential real property as that "which is being used *primarily* for residential purposes" (emphasis added)). The definition of residential real property in SDCL 43-4-37(3) focuses only upon the number of dwelling units within a single structure, not its primary use among other potential uses. *See Richman v. Hartley*, 169 Cal. Rptr. 3d 475, 480 (Cal. Ct. App. 2014) (holding that California real estate statute "applies to any transfer of real property . . . regardless of whether the property also has a commercial use" because the statute's language did not limit its application to property that *only* contained residential units).

[¶35.]     Here, we conclude a property disclosure statement was required for the Campground's living quarters.[7] While there may be instances where it is difficult

---

7.     Iverson argues the Remingtons waived receiving a disclosure statement by purchasing the property "as is." However, this simply begs the question of whether Iverson breached a duty to advise them of the seller's disclosure statement. If his failure to do so was a breach of his fiduciary duty, then any waiver by the Remingtons would not be supported by "a showing of a clear, unequivocal and decisive act or acts showing an intention to relinquish the existing right." *Oxton v. Rudland*, 2017 S.D. 35, ¶ 22, 897 N.W.2d 356, 362 (quoting *Norwest Bank S.D., N.A. v. Venners*, 440 N.W.2d 774, 775 (S.D.

(continued . . .)

to distinguish residential portions of property from its other aspects, we need only apply the correct rules to decide the case before us. And the undisputed material facts establish that the Campground's living quarters constituted a single dwelling unit. The living quarters included bedrooms, bathrooms, a living room, and kitchen. The rest of the Campground, however, is much different; the other features and facilities are related to the Campground's commercial purpose, and none of the parties argue they constitute a family dwelling unit. As a result, the disclosure form would only apply to the defects associated with the living quarters, which, in this case, means that the water penetration and mold issues should have been disclosed.[8]

[¶36.]　　　In addition to its textual basis, this conclusion also avoids an unwarranted disparity between purchasers of exclusively residential property and those purchasing real property that has a commercial component *and* a family dwelling unit. In *Fuller v. Croston*, for instance, we held that a residential real estate seller was required to notify prospective buyers of previous water penetration issues using a statutory seller's disclosure form. 2006 S.D. 110, ¶¶ 19–20, 725 N.W.2d 600, 607. Surely, a purchaser of a family dwelling unit that is included

---

(. . . continued)

　　1989)). *Cf. Lucero v. Van Wie*, 1999 S.D. 109, 598 N.W.2d 893 (holding the buyer waived a disclosure statement where the contract for deed contained an "as is" clause, the buyer had the opportunity to inspect the premises twice, and the buyer was aware of defects on the property prior to purchasing it).

8.　　During the February 2019 summary judgment hearing, Iverson's attorney recognized that the statutory seller's disclosure issue had this type of limited applicability even if the Remingtons prevailed.

-14-

within commercial property is no less worthy of receiving the benefit of a seller's disclosure statement than a purchaser of exclusively residential property.

[¶37.]     In fact, requiring disclosure of defects associated with a residential component of real property aligns with SDCL 43-4-38's purpose. *See Fuller*, 2006 S.D. 110, ¶ 23, 725 N.W.2d at 608 ("One obvious purpose of the disclosure statutes is to provide prospective buyers with information about material defects known to the seller concerning the property." (quotation and citation omitted)); *see also Schwartz v. Morgan*, 2009 S.D. 110, ¶ 10, 776 N.W.2d 827, 830 (explaining that "South Dakota's detailed disclosure statutes abandoned the doctrine of caveat emptor in favor of full and complete disclosure of defects of which the seller is aware" (cleaned up)).

[¶38.]     Still too, requiring a property disclosure statement benefits not only the buyer but the seller as well. In fact, SDCL 43-4-40 shields a seller from liability for defects discovered by the buyer after the sale "if the seller truthfully completes the disclosure statement." Therefore, we determine that requiring a property disclosure statement to residential aspects of real property is consistent with both our statutes and decisional law.

[¶39.]     But despite having determined the previously unsettled issue of a property disclosure statement's applicability to mixed-use property, the question whether Iverson breached the duty in these circumstances remains and cannot be resolved on the current record. As a result, we affirm the circuit court's determination that a property disclosure statement was not required for the alleged defects unrelated to the living quarters. However, we reverse the court's

determination that a seller's disclosure statement was not required as to the living quarters, and we remand the case to the circuit court for further proceedings to determine whether Iverson breached his fiduciary duty to inform the Remingtons that Grimm either was or may have been required to provide a property disclosure statement.

[¶40.] This remand may well involve a trial and include, as the Remingtons' attorney referenced during Iverson's deposition, expert evidence regarding Iverson's duty to discuss the seller's disclosure statement with the Remingtons in the absence of a clear rule that one was required. And like in *Jacquot*, a jury may be instructed on *Saiz v. Horn's* fiduciary duty rules and left to make a determination whether Iverson breached his duty.

### *Iverson's direct liability*[9]

[¶41.] Although an agent has "no duty to uncover and disclose defects in the seller's property[,]" a real estate agent's fiduciary duty does include the obligation "to use reasonable efforts to fully, fairly and timely disclose information to their principals within their knowledge[.]" *Saiz*, 2003 S.D. 94, ¶¶ 11, 13, 668 N.W.2d at 336 (citation omitted). A limited agent also has a duty "[t]o perform the terms of any written agreement made with the client[.]" SDCL 36-21A-140(1).

---

9. The Remingtons do not develop specific arguments among their claims of fraudulent misrepresentation, fraudulent concealment, and willful and wanton misconduct (counts 2–4). Iverson correctly notes this and argues the Remingtons have waived argument considering these claims. In our view, however, the Remingtons' assertion of Iverson's direct liability can be sourced generally to counts 2–4 of the complaint.

[¶42.]    The Remingtons point to Iverson's deposition testimony in support of their claim that Iverson failed to disclose material defects with the property:

> [Remingtons' counsel]:    So you would agree with me that as a real estate agent for the Remingtons you have an obligation to disclose all known material facts about the property which could affect the buyer's use or enjoyment of the property?
>
> Iverson:    No.

[¶43.]    And after reading under the heading "Agent's Obligations" from the agency agreement, the Remingtons' attorney asked Iverson whether those duties accurately described his obligations, to which he responded, "I did what the Remingtons asked me to do." Similar forms of this question-and-answer exchange occurred five more times. After a break, Iverson stated he "want[ed] to change his testimony" and acknowledged that "[i]f there were items that needed to be disclosed, they would need to be disclosed."

[¶44.]    But even if Iverson's deposition testimony shows a degree of intransigence, it ultimately does not preclude summary judgment on the Remingtons' direct claims of nondisclosure. Iverson can only be liable for failing to disclose material defects if he had *knowledge* of them. *See Saiz*, 2003 S.D. 94, ¶ 13, 668 N.W.2d at 336. And, likewise, Iverson is obligated under the agency agreement to "[d]isclose all *known* material facts about the property which could affect the buyer's/tenant's use or enjoyment of the property[.]" (Emphasis added.)

[¶45.]    This view is also supported by statutory authority within chapter 36-21A, which applies to real estate agents:

> In any agency or brokerage relationship, the licensees, each client or customer, and the real estate brokerage are required to

> possess *only actual knowledge and information.* There is no imputation of knowledge or information by operation of law among or between the clients or customers, the real estate brokerage, and its licensees.

SDCL 36-21A-148 (emphasis added); *see also Fuller*, 2006 S.D. 110, ¶ 39, 725 N.W.2d at 611 (concluding the agent was only liable for not disclosing defects and misrepresentations of her client if she had actual knowledge of them).

[¶46.] In addition, where "knowledge" is defined in other chapters, it is often defined as "actual knowledge." *See, e.g.*, SDCL 57A-1-202 (defining "knowledge" as "actual knowledge"); SDCL 34-26-49(14) (same); SDCL 55-18-1(10) (same); SDCL Code of Judicial Conduct, App., Ch. 16-2 (same); SDCL 47-33-3 (same). Actual knowledge is "[d]irect and clear knowledge[.]" Black's Law Dictionary (11th ed. 2019).

[¶47.] The Remingtons have failed to allege facts sufficient to establish that a genuine dispute as to Iverson's knowledge exists. And when asked about Iverson's knowledge in written interrogatories, the Remingtons simply asserted that Iverson "should have known" of the defects given his long-term personal and professional relationship with Grimm. During his deposition, Duane Remington acknowledged that he did not have any personal knowledge or evidence that Iverson actually knew of any of the alleged defects.

[¶48.] Further, Iverson stated during his deposition that any information he had about the listing came from Grimm. Grimm confirmed that it was his "responsibility to provide that information to Mr. Iverson[,]" and Grimm denied Iverson ever asked about problems with the property. When Grimm was asked

whether he had told Iverson about each alleged defect, his response to every question was, "No."

[¶49.] Finally, Iverson claimed "I didn't know" when asked whether a portion of the deck was in the right-of-way. Nor was he aware of the basement's water penetration issues. And as to the financial condition of the property, the only knowledge Iverson had was acquired through the financial statements Grimm gave him. However, unlike the alleged defects, Iverson did represent something to the Remingtons—he told them the Campground made $240,000 to $245,000 per season. But the Remingtons have not produced facts to support their claim that this was a misrepresentation or even inaccurate. Rather, the evidence establishes that the Remingtons knew the dollar figure was a gross calculation, and the Remingtons made assumptions regarding the cost to operate the Campground. Thus, the record contains no evidence of Iverson's actual knowledge of any of the alleged defects.

## Conclusion

[¶50.] As their real estate agent, Iverson owed the Remingtons a fiduciary duty. A property disclosure statement was required for the living quarters which constitute residential real property. We reverse the circuit court's determination to the contrary. As to the non-residential aspects of the Campground, however, we affirm the court's determination that a seller's disclosure statement was not required. But the existence and extent of this statutory disclosure obligation was not clear until our decision here, and a remand is necessary to determine whether Iverson breached his duty to the Remingtons under the particular facts of this case.

[¶51.]     We affirm the circuit court's grant of summary judgment on the claims of Iverson's direct liability.  Iverson cannot be liable for his failure to personally disclose alleged material defects relating to the property because the Remingtons have failed to establish that a genuine disputed material fact exists as to Iverson's knowledge of the alleged defects.

[¶52.]     JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.